No. 92,544

STATE OF KANSAS, *Appellee*, v. AKIRA T. BROWN, *Appellant.*

(173 P.3d 612)

264

Opinion filed December 7, 2007.

*Carl F.A. Maughan*, of Maughan & Maughan, LC, of Wichita, argued the cause, and *Sarah Ellen Johnson*, of Kansas Appellate Defender Office, was with him on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Akira Brown was convicted of first-degree premeditated murder after James Cooper died of a single gunshot wound to the head. According to the prosecution's theory, the shooting was motivated by animosity between rival street gangs. Several eyewitnesses identified Brown as the shooter and, after several hours of interrogation, he confessed. In defense arguments to the jury, Brown's attorney suggested police focused on Brown as the suspect within a few minutes after the shooting and, con-

sequently, ignored evidence pointing to other suspects. Further, defense counsel argued Brown's confession was coerced.

On appeal, Brown raises several issues. We first consider his argument that his confession was not voluntary. The fact that Brown was handcuffed to a table for a 12-hour span during which several periods of interrogation occurred makes the issue of voluntariness a close question. An examination of the totality of the circumstances, however, leads us to the conclusion that Brown's free will was not overborne and his confession was freely and voluntarily given.

Next, we consider whether the admission of several hearsay statements violated Brown's right to confrontation and whether the statements met any hearsay exceptions. Applying *Davis v. Washington*, 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006), and *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), we conclude the statements, which were made at the scene shortly after the shooting by an unidentified emotional bystander to one of approximately 200 other bystanders, were not testimonial and, therefore, did not violate the Confrontation Clauses of the United States and Kansas Constitutions. Further, we find that all but one of the statements were properly admitted under a hearsay exception, specifically the excited utterance exception. See K.S.A. 60-460(d)(2). One statement was not properly admitted, however, because it was double hearsay and a foundation was not laid for the included statement. This error does not require reversal of Brown's conviction, however, because there were other eyewitness identifications of Brown as the shooter and because Brown confessed to being the shooter, making the evidence cumulative and the error harmless.

We find no merit to Brown's remaining arguments. We conclude that the trial court did not commit error in admitting gang evidence because the evidence tied Brown and the victim to rival gangs and the evidence of the rivalry provided a motive for an otherwise inexplicable crime. Additionally, we conclude there was not an evidentiary basis for giving a voluntary manslaughter instruction as a lesser included offense because the evidence was that Brown interjected himself into the fight that preceded the shooting, there

was no showing of prior animosity between Cooper and Brown, and the fight that preceded the shooting would not have placed a reasonable person in Brown's position in fear of great bodily harm or at risk of death. Next, we conclude the trial court did not err in refusing to admit speculative testimony tending to suggest a third party committed the shooting because there is no evidence actually tying an alleged third party to the crime. Finally, we reject Brown's request to find cumulative error requiring reversal of his convictions.

## FACTS

The rivalry that formed the basis of the State's theory of the case was between the Bloods and Junior Boys gangs. The Junior Boys gang, which consists of "older" gang members, has two subsets formed of younger members: the Second Street Junior Boys and the Hill Block Junior Boys. Officer Espinoza, a gang intelligence officer, testified that tension between the Bloods and Junior Boys had resulted in several violent incidents separate from the current crime. Espinoza mentioned gang intimidation, various forms of "disrespect," shootings, and murder. History had shown that verbal confrontations between a Blood and a Junior Boy could easily escalate into physical violence when gang members "back-up" fellow members.

The victim of the shooting in this case, James Cooper, was a member of the Bloods. Shortly after midnight on January 11, 2003, Cooper and his girlfriend, Cecilia Arnold, joined several Bloods gang members at "The Cave" nightclub in Wichita. Members of the Hill Block and Second Street Junior Boys gangs, including Brown who is a member of the Hill Block gang, were also present at "The Cave."

When the nightclub closed around 2 a.m., a crowd estimated to number "a couple hundred" exited onto the streets and sidewalks around the club. Several fights broke out in the crowd.

According to Arnold, she and Cooper prepared to leave in Arnold's car when Terrell Cole—a member of the Second Street gang (one of the Junior Boy subsets and a rival gang to Cooper's gang)—ran in front of the car, chasing two persons while holding a gun.

The couple got out of the car because Cooper wanted to tell the others to "quit tripping" or calm down. Arnold testified that Cooper basically followed Cole and told him to stop fighting and put away the gun, saying, "We all kicked it. We all had fun. Let's call it a night." Arnold indicated that, although she did not see the gun anymore, Cole kept a "cocky" and "bodacious" attitude toward Cooper. Cooper told Cole he would remember how Cole was acting. Arnold was not certain where Cole went after the conversation with Cooper, but she thought he "kind of mingled off into the crowd."

Cooper's cousin Bruce Berry had walked up at some point during the confrontation, and he also spoke to Cooper. Then, Arnold and Cooper, holding hands, started to walk away but stopped when they saw a commotion in the crowd. A single shot rang out, and the bullet struck Cooper in the back of his head causing a fatal wound.

Arnold told police that, although she did not actually see the shooting, she believed the shooter was Cole. When asked where she had stood talking with Cooper and his cousin Berry, Arnold testified that they stood "in the middle of Second Street," near the nightclub at Second Street and Mosley.

Russell Hunt was also in the crowd of people exiting the nightclub. According to his testimony, he observed the altercation occurring in the road at Second Street and Mosley. Hunt first saw three to four individuals "jumping" one man on the ground. Then, Hunt saw a man pull a handgun out of the waistband of his pants, point it toward the middle of Second Street, and fire a single shot. Hunt described the man as wearing a cream-colored shirt. He stated the man was standing beside a tree. After taking cover and then seeing that someone was hit, Hunt called 911 and helped clear the way for an ambulance.

Hunt talked to an officer about what he had seen. As he did so, he noticed another man standing there, looking "very distraught." After he finished talking to the officer, Hunt asked the bystander what was wrong. Hunt testified that the bystander told him "That's my cousin" and "They said Lovey shot him." Although Berry was identified as Cooper's cousin, the bystander who talked to Hunt

was never identified. Police knew Brown was nicknamed "Lovey," and other eyewitnesses identified Brown as "Lovey."

Later, after reviewing a photographic lineup, Hunt identified Brown as the shooter.

Another eyewitness was Devon Brown (who will be referred to as Devon to avoid confusion with the defendant Brown). Devon testified she actually saw Brown fire the shot. Devon was at the nightclub, and she saw Brown there earlier that evening. Devon testified that she had gone to the same high school as Brown and had no difficulty recognizing him. She also knew him as "Lovey." When the club closed, Devon attempted to drive away from the scene on Second Street but saw an altercation in the middle of the crowded street. Next, Devon saw two men walking backwards as if one was trying to break up an argument and "he was pushing his friend away from the altercation." Devon and her passenger got out of the car to see if they recognized anyone in the midst of the fight. Devon saw Brown step out from a tree, raise a gun, and fire a shot in the direction of the fight. After Brown fired the gun, he took off running eastward on Second Street.

Berry, who had talked to Cooper just before the shooting, also identified Brown as the shooter. Berry testified that he saw Brown inside the nightclub on the night of the incident and described him as wearing a cream-colored shirt. After the club had closed, Berry started to pull away in his car but then got out to carry on two separate conversations, one of which included Cooper and Cooper's girlfriend Arnold. Berry had finished talking to the couple and turned to go back to his car when he heard a gunshot coming from behind. He ducked and ran toward his car. Berry testified that as he put his foot inside the car, he turned to see Cooper lying on the ground. According to Berry, he saw Brown standing near a tree, holding a gun. Then, he saw Brown run eastward on Second Street with the gun held down to his side.

Police dispatch notified patrol officers to be on the lookout for a suspect nicknamed "Lovey." Officers checked Brown's known addresses and eventually went to a recent address at an apartment complex. Around 3:17 a.m., a vehicle drove into the parking lot

and officers saw the passenger was a black male wearing a "tan" shirt. The passenger was Brown.

Brown was placed in custody and taken to the police station, where he was given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). He was handcuffed to a table and held in an interrogation room for approximately 12 hours during which he was interrogated periodically by two detectives for a total of approximately 5 hours. During breaks in the interrogation, Brown napped, was given restroom breaks, and was allowed to eat.

Brown's version of events changed numerous times over the course of his interview. At first, he said that he stood outside the club talking to a woman he called "Dee," noticed a few fights, and then heard some "gunshots." Brown told the detectives he was standing next to a car on the north side of Second Street at the time of the shooting. He indicated that Dee left with him in the car immediately thereafter.

When Detectives James Hosty and Timothy Relph told Brown that eyewitnesses placed him in a different location—in the middle of a fight—he initially said that Dee and two men were with him at the scene and would verify his story. Brown's interview was put on hold for approximately 3 hours and 15 minutes while these three witnesses were located and interviewed at the station. Then, Detectives Hosty and Relph returned to their interview with Brown.

The officers informed Brown that they had spoken to the three individuals, but none had verified anything he had previously told them. At first, Brown continued to say he was with the three others, but then his story changed. Eventually, he told the officers that he saw a large black male, a possible gang member, outside of the club fighting and that the fight moved out into the street. Although Brown said he did not know the man's name, he identified Cole, through a photo, as the person involved in the altercation. Brown admitted that the two men he had earlier identified were not with him during the shooting, but stated that he was walking down Second Street when the shots were fired.

In another version of events, Brown said "Big 2," later identified as Cole, handed an unknown black male a handgun and the un-

known male shot Cooper in the middle of the street. Then, Brown changed his story to state that the unknown male was actually Adrian Patterson, also known as "Al." He told the officers that he stood close to Patterson along with Cole next to the fight and that Patterson was the person who shot Cooper.

At another point in the police interview, Brown said that while Cole was arguing with Cooper, Cole handed Patterson a gun and when Patterson raised the gun, Brown put his hand on the gun in an attempt to stop the shooting just as the gun fired. Finally, when the officers told Brown that witnesses saw only one person holding a gun, not three, he began to cry and admitted that he was the one who fired the gun.

## ANALYSIS

### 1. *Voluntariness of Confession*

Before trial, Brown filed a motion to suppress his statements to police officers. The trial court conducted a hearing and, after reviewing the video recording of the police interview, found there was no evidence indicating that Brown's will was overborne. In reaching this determination, the court observed that Brown was advised of his *Miranda* rights, waived those rights, and agreed to speak with the officers. Also, Brown was 21 years old at the time of the interview, appeared to be a person of reasonable intelligence, and had previous exposure to the criminal justice system. As for the officers' interrogation techniques, the trial court found they were not overly aggressive and the officers did not promise Brown anything or threaten him in any way. Further, although Brown was held in the interrogation room for nearly 12 hours and was handcuffed to the table, the actual interview time totaled just under 5 hours. And in the periods between questioning, during which the officers stopped to investigate various aspects of the case based on information gleaned from Brown, it appeared that Brown was napping. Brown was also given breaks to use the restroom and to eat a meal.

### Standard of Review

When analyzing a trial court's decision to deny suppression of a confession, an appellate court reviews "the factual underpinnings

of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." An appellate court does not, however, "reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence." *State v. Harris*, 284 Kan. 561, Syl. ¶ 9, 162 P.3d 28 (2007); *State v. Ackward*, 281 Kan. 2, Syl. ¶ 1, 128 P.3d 382 (2006); *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005).

It is well established that voluntariness of a confession must be determined under the totality of the circumstances. The State has the burden of proving that a confession is admissible, and the required proof is by a preponderance of the evidence. The essential inquiry is whether the statement was the product of the accused's free and independent will. 284 Kan. at 579; *State v. Gonzalez*, 282 Kan. 73, 103, 145 P.3d 18 (2006). Numerous factors are to be considered when determining if a statement was voluntary, which this court has consolidated into the following list based on previous Kansas case law:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007).

## Totality of the Circumstances

Mental State. Brown does not specifically argue that his mental state played a part in impeding the voluntary nature of his confession. At trial, Brown presented evidence he had some drinks at "The Cave" nightclub, but the officers testified that Brown did not appear to be under the influence of alcohol. The interrogation videos show that Brown's responses were appropriate for the questions asked, and there is no indication in the record that he was under the influence of drugs or alcohol.

Duration and Manner. As previously indicated, the length of Brown's confinement to the interrogation room, while handcuffed to a table for long periods of time, causes the issue of voluntariness to be close. Granted, there were legitimate reasons for delay while Brown's version of events were investigated. However, the legiti-

macy of or justification for the delays does not erase the concern over whether the length of time of confinement in the interview room while handcuffed to a table was so excessive as to be coercive. Nor can such reasons be a license for law enforcement to extend interviews to such an excessive length that a suspect's will is overborne. On the other hand, it would be inappropriate for us to draw a bright line and state a specific time period where an interrogation becomes inherently coercive solely because of its duration. But see *Ashcraft v. Tennessee*, 322 U.S. 143, 153-54, 88 L. Ed. 1192, 64 S. Ct. 921 (1944) (36-hour interrogation inherently coercive).

The trial court made a distinction between the number of hours of confinement and the number of hours of interrogation. Certainly, as part of the totality of the circumstances the differentiation is a consideration. See *United States v. Lopez*, 437 F.3d 1059, 1063-64 (10th Cir. 2006) (Tenth Circuit Court of Appeals' enumeration of factors regarding voluntariness of confession include [1] the age, intelligence, and education of the defendant; [2] the length of detention; [3] the length and nature of the questioning; [4] whether the defendant was advised of his constitutional rights; and [5] whether the defendant was subject to physical punishment). Decisions from other states distinguish between the time of interrogation and the time of detention, considering such factors as whether significant breaks in questioning occurred or, in other words, whether the pressuring was unrelenting. See, *e.g., State v. Agnello*, 269 Wis. 2d 260, 273-74, 674 N.W.2d 594 (Wis. App. 2003) (discussing issue of duration and collecting cases where time of detention ranged from 8 hours to 7 days).

While the overall length of detention cannot be ignored, we have concluded that statements were voluntary when similar lengths of time were involved. See *Walker*, 283 Kan. at 596-97 (upholding statements as voluntary where defendant was held for almost 13 hours and confessed to committing crime after about 8 hours); *Ackward*, 281 Kan. at 8 (upholding statements as voluntary where defendant's interrogation lasted 8 or 9 hours); *State v. Grissom*, 251 Kan. 851, 919-20, 840 P.2d 1142 (1992) (confession voluntary where defendant was handcuffed the entire time during an 8-hour interview, with breaks for meal time and restroom); *State v. Wil-*

*liam*, 248 Kan. 389, 409-10, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991) (upholding statements as voluntary where defendant was interrogated for approximately 6 hours over a 19-hour period).

The time period of the detentions involved in the Kansas cases cited above and the 12 hours in this case stretch to the temporal boundaries of an uncoercive interrogation. We cannot say, however, that under the circumstances of this case—where breaks were taken, Brown was allowed to leave the room for short periods, and he napped—the duration and manner of the interview were coercive.

Outside Contact. Next, Brown contends he was denied contact with the outside world. Brown points to three occasions during the interrogation when he asked if he could make a phone call, and his requests were denied. He focuses on the third instance, where Detective Relph told Brown he could either tell the officers what happened or make a phone call, "but [the two were] not tied together." Brown takes this comment out of context and argues that the comment implied a warning not to bring a lawyer into the negotiations with the officers. When the statement is examined in context, this implication is nonexistent.

Detective Hosty explained at trial, "[W]e were talking about who was doing the shooting and he comes out of the blue asking about the phone call, and we didn't want him to misunderstand that [it] was a deal for anything." We further note that when Brown asked Officer Espinoza, who had looked in to check on him during one of the breaks, to contact Brown's foster mother about the situation, Espinoza agreed to do so. There was no indication the request was related to an assertion of Brown's right to counsel or that the denial of access in any way chilled his assertion of this right.

This court has stated that refusing a request for outside contact is not per se coercive. "While isolation from the outside world can be a factor in making an interrogation coercive, it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation." *Walker*, 283 Kan. at 598. In *Walker*, this court rejected the defendant's contention that he was coerced by the officers' denying him contact with the outside world. 283 Kan. at

598. At various times, Walker was not permitted to speak to his father who was sitting in the waiting area at the police station or to call his grandmother. The *Walker* court noted that the police told Walker they were talking to other witnesses simultaneous to his interview. At one point Walker asked what one of the witnesses had said. When the officers refused to tell him, Walker immediately asked to speak to his father. This court found the timing and context of Walker's request suggested his motivation for seeking outside contact was to gather information and also explained the officers' reluctance to grant his request. 283 Kan. at 598.

In the present case, similar to *Walker*, the officers told Brown they were talking to other witnesses. They specifically took breaks to locate Brown's supposed alibi witnesses and to ask questions of witnesses during the course of Brown's interview. Brown's version of the events and identification of the shooter changed during the interrogation, and it was during a discussion about who committed the act of shooting that Brown asked about a phone call. Understandably, the officers would have been reluctant to grant Brown's request when the timing and context suggested a motivation for gathering information.

One cannot conclude that, in this case, Brown's requests for a phone call or the officers' responses coerced Brown's confession.

Age, Intellect, and Background. The evidence showed that Brown was 21 years old and had previous experience with the judicial system. The trial court found that Brown appeared to be a person of reasonable intelligence, and there is nothing in the record that would render that finding unsupported.

Fairness of the Officers. Brown focuses much of his argument upon this factor, arguing the police tactics were coercive because the officers were "unfair" and told Brown he could be hurt by not telling them "why" the shooting occurred. The trial court found the officers were not overly aggressive and did not promise Brown anything or threaten him in any way.

Brown first complains that the officers put "emotional pressure" on him. He takes issue with the fact that Detective Hosty asked something to the effect of "Do you want me to look your 4-year-old son in the eye and tell him Daddy put a gang before him?

Because I'll do it." Brown argues that the officers then placed more emotional pressure on him by telling him he was hurting his mother and his child by sticking with his original statement in which he denied any involvement in the shooting.

The officers were basically asking Brown to tell the truth. Urging the accused to tell the truth does not render a confession involuntary. See *State v. Newfield,* 229 Kan. 347, 359, 623 P.2d 1349 (1981); *State v. Tillery,* 227 Kan. 342, 344, 606 P.2d 1031 (1980). As this court has stated:

" ' " 'If [an extrajudicial confession] has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. However, the advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent.' " ' [Citations omitted.]" *State v. Wakefield,* 267 Kan. 116, 128, 977 P.2d 941 (1999).

The officers' statements regarding Brown's family were not an attempt to extort by fear; they were merely admonitions to be honest.

With regard to Detective Hosty's request for an explanation of why the shooting occurred and the statement that Brown could get hurt if he did not do so, Brown argues that the officer's tactic was deceptive because it implied that he would get a lesser penalty if he cooperated. He also points to one officer's statement that the "truth would not look bad" and that "[i]f we get the truth from start to finish, we can get up and say we got the truth." The officers also told Brown there is a difference between degrees of murder, mentioned 40 years' imprisonment for first-degree murder and said that "[n]ot everybody is a first degree murderer." Brown acknowledges that the officers did not explicitly threaten to tell the prosecutor if he had not cooperated, but Brown asserts that "the implication was clear."

This court has held that in order to render a confession involuntary as a product of a promise of some benefit to the accused, including leniency, the promise must concern action to be taken by a public official; it must be such that it would be likely to cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believes to have the power or authority to execute it. *State*

*v. Banks*, 260 Kan. 918, 925, 927 P.2d 456 (1996); *State v. Norris*, 244 Kan. 326, Syl. ¶ 6, 768 P.2d 296 (1989); see also *Tillery*, 227 Kan. at 344 (statement about things going "better" if truth told not promise of benefit vitiating voluntariness of defendant's confession). There were no such promises or threats in this case.

In *State v. Harris*, 279 Kan. 163, 170, 105 P.3d 1258 (2005), this court cited *Wakefield*, for the controlling principle that "[d]eceptive interrogation techniques alone do not establish coercion." We also discussed this issue in *Swanigan*, 279 Kan. at 32, where the court stated: "[U]nder *Wakefield*, the false information must be viewed as a circumstance in conjunction with others, *e.g.*, additional police interrogation tactics." In *Swanigan*, the interrogating officers urged Swanigan to confess to the crime so they could report that he cooperated. When Swanigan denied involvement in the crime, the officers threatened Swanigan with telling the district attorney that he had refused to cooperate and suggested the district attorney would reject any deal for leniency. The officers further indicated that Swanigan could be charged with five robberies instead of one unless he confessed. This interrogation tactic involved an implied or express detriment if the defendant refused to cooperate, which the *Swanigan* court found may amount to suggesting to a suspect that his or her exercise of the constitutional right to remain silent could result in harsher treatment. 279 Kan. at 34-35. The court refused, however, to regard even that tactic as "one which makes the confession involuntary per se." Rather, it is "one factor to be considered in the totality of circumstances." 279 Kan. at 37.

The *Swanigan* court ultimately held that, under the circumstances, the repeated use of false information combined with Swanigan's low intelligence and susceptibility to being overcome by anxiety, police threats, and promises constituted coercion that produced an involuntary statement. 279 Kan. at 39. In contrast to *Swanigan*, there is no evidence that Brown had low intelligence and no testimony indicating that Brown was susceptible to being overcome by anxiety. Brown was calm, he rested when left alone, and he carried on intelligent conversations with the officers when

being questioned. As previously discussed, the trial court found that Brown appeared to be of "reasonable intelligence."

The statements concerning the "why" of the crime and the degrees of punishment are more akin to those made in *State v. Johnson*, 253 Kan. 75, 84, 853 P.2d 34 (1993), where this court upheld a finding of voluntariness after an officer stated he would go to the district attorney and tell him if the defendant was cooperating. The court determined that the officer did not bargain with or promise Johnson anything either directly or by implication. 253 Kan. at 84; see also *Walker*, 283 Kan. at 599-602 (admissible portion of confession not involuntary where officers indicated cooperation could impact severity of sentence but also stated sentencing was up to the court and no promises could be made); *State v. Ninci*, 262 Kan. 21, 39, 936 P.2d 1364 (1997) (interrogating officers told Ninci that "[y]ou can do some things to help yourself now"); *State v. Harwick*, 220 Kan. 572, 575-76, 552 P.2d 987 (1976) (interviewing officer's mere offer to talk to district attorney did not render defendant's confession involuntary).

Consequently, the officers' conduct was not of a nature to overcome Brown's free will and render his statements involuntary and inadmissible.

Fluency. No question was raised in this case regarding Brown's English fluency.

Totality of the Circumstances. As discussed above, while the duration and manner of the interview are troubling, on that basis alone we do not conclude that Brown's free will was overborne. An examination of the totality of the factors and circumstances of the interrogation lead to the conclusion the statements were the product of Brown's free and independent will.

## 2. *Admission of Hearsay*

In another issue on appeal, Brown argues that the trial court erred by admitting hearsay statements into evidence. He takes issue with the court's decision to permit Russell Hunt to testify about statements made by another individual (declarant), whose name he did not know, at the scene of the crime. The declarant identified the victim as his cousin and the shooter as "Lovey." Officers never

positively identified the person who spoke to Hunt. The trial court found that the statement was admissible as an excited utterance under K.S.A. 60-460(d)(2).

On appeal, Brown contends for the first time that Hunt's trial testimony violated his rights of confrontation under the United States Constitution and the Kansas Constitution Bill of Rights. Then, again for the first time, Brown alleges that one statement spoken to Hunt was a double hearsay statement, *i.e.* hearsay within hearsay. The State disagrees with this characterization and contends that Brown misinterprets Hunt's testimony.

## Double Hearsay

The accurate characterization of the level of hearsay could be significant in a case because when an out-of-court statement includes a statement made by another declarant and both statements are offered for the truth of the matter stated, both levels of hearsay must meet the requirements of a hearsay exception. K.S.A. 60-463 (multiple hearsay); see *State v. Davis*, 2 Kan. App. 2d 698, 699, 587 P.2d 3 (1978), *rev. denied* 225 Kan. 846 (1979). Likewise, a Confrontation Clause analysis must not ignore any such multilevel hearsay issues. We, therefore, will first consider whether the statement is double hearsay.

At a pretrial hearing to determine, *inter alia*, the admissibility of the statements, Hunt testified that right after the shooting, he talked to a dark-skinned man near the victim's body. Hunt recognized this individual from school but did not know his name. The man said he was the victim's cousin. When the paramedics started arriving about 5 minutes after the shooting, the man kept repeating, "Lovey shot him. Lovey shot him." Hunt said the man had tears in his eyes, was "flustered," and was "almost to the point of cussing."

It was after this hearing on the parties' motions that the trial court held the statements were admissible as an excited utterance. Then, during trial, Hunt gave the following testimony:

"Q. Sir, when you told the officer what you observed, did you talk to any other eyewitnesses at that time?

"A. Yes.

"Q. Could you tell us about that?

"A. One individual. When I was standing there talking to the officer, he was in distress and I asked him what was wrong and he said, 'That's my cousin. That's my cousin.'

"[Defense Counsel]: I'm going to make my contemporaneous objection to the hearsay.

"THE COURT: Very Well. It will be noted for the record.

"Q. Go ahead.

"A. At that time he said, 'It's my cousin. It's my cousin. *He's like, They said Lovey shot him. Lovey shot him.*'

"Q. And did he seem physically upset to you?

"A. Oh, yes. He was very distraught, almost in tears." (Emphasis added.)

Brown's double hearsay argument is based upon Hunt's statement *"They* say Lovey shot him," as compared to the preliminary hearing testimony that the unknown bystander said, "Lovey shot him." The State suggests in its appellate brief that Hunt merely used the word "they" as another way to refer to the unidentified man.

To adopt the State's argument and accept that the use of the word "they" was really meant to be "he" would require us to determine that Hunt did not intend to use "they." We cannot make this assumption. It may be that Hunt's mistake was in his prior testimony when he failed to say "they." Or, it might be that after the preliminary hearing he recalled that the bystander had said "they." A number of additional explanations could be postulated. Such an exercise is meaningless, however, because it is inappropriate for us to speculate on what the witness meant to say; we must consider the issue based upon what the witness actually said. As a result, the statement must be considered as double hearsay.

## Contemporaneous Objection

The State notes that defense counsel made no objections pertaining to an unknown third-party declarant or to a Confrontation Clause violation. Brown does not dispute that he failed to specifically object on these grounds.

K.S.A. 60-404 provides that no verdict shall be set aside based upon the erroneous admission of evidence unless an objection was "timely interposed and so stated as to make clear the specific

ground of objection." Generally, constitutional grounds for reversal are subject to this same rule, and objections raised for the first time on appeal are not properly preserved for appellate review. *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007); *State v. Gonzalez*, 282 Kan. 73, 114, 145 P.3d 18 (2006).

A recognized exception to that general rule, however, applies when consideration of the newly asserted claim is necessary to serve the ends of justice or to prevent a denial of fundamental rights. *State v. Moody*, 282 Kan. 181, 192, 144 P.3d 612 (2006); *State v. Williams*, 275 Kan. 284, 288-89, 64 P.3d 353 (2003). Applying this exception, this court has considered Confrontation Clause claims even though defendants failed to raise this objection if the trial occurred before the landmark decision in *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which abrogated *Ohio v. Roberts*, 448 U.S. 56, 63, 65 L. Ed. 2d 597, 100 S. Ct. 2531(1980) (which allowed hearsay testimony of an unavailable witness if evidence fit within a firmly rooted hearsay exception or otherwise contained adequate indicia of reliability). *State v. Miller*, 284 Kan. 682, 709, 163 P.3d 267 (2007) (considering confrontation issue " 'necessary to serve the ends of justice' " in light of recent developments to the law regarding defendant's confrontation rights); see also *State v. Corbett*, 281 Kan. 294, 308-09, 130 P.3d 1179 (2006) (ruling that hearsay statements were not testimonial and that defendant failed to preserve the issue for appeal); *State v. Torres*, 280 Kan. 309, 319, 121 P.3d 429 (2005) (considering recurring arguments regarding Confrontation Clause asserted for first time on appeal).

In light of that allowance, the double hearsay must be considered because "[t]he admission of double level hearsay . . . creates far greater obstacles to the accused's right to confront the witness against him than does the admission of single level hearsay," *United States v. Daniels*, 572 F.2d 535, 539 (5th Cir. 1978). Additionally, as the witness was beginning to answer, defense counsel objected to hearsay, the objection was noted for the record, and the witness was directed to "[g]o ahead." The fact that counsel did not immediately rise to his feet to state another hearsay objection does not defeat Brown's right to present the issue.

## Confrontation Clause

We will begin our analysis with the constitutional challenge to the evidence under the federal and state Confrontation Clauses. Issues related to confrontation under the Sixth Amendment to the United States Constitution or the Kansas Constitution Bill of Rights, § 10 raise questions of law over which this court exercises de novo review. *State v. Henderson*, 284 Kan. 267, 276, 160 P.3d 776 (2007); see *State v. White*, 284 Kan. 333, 345, 161 P.3d 208 (2007).

The Sixth Amendment's Confrontation Clause provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Crawford*, 541 U.S. at 42. This federal principle is applied to the States through the Fourteenth Amendment to the United States Constitution. *Pointer v. Texas*, 380 U.S. 400, 403-06, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965). Similarly, a criminal defendant in Kansas has the right to "meet the witnesses face to face." Kansas Constitution Bill of Rights, § 10; see also *State v. Blanchette*, 35 Kan. App. 2d 686, 699, 134 P.3d 19, *rev. denied* 282 Kan. 792 (2006) (right of confrontation under federal Constitution and the right to meet witnesses face to face under Kansas Constitution are satisfied when defendant has had opportunity to cross-examine witnesses against defendant).

Under the 1980 decision of *Roberts*, 448 U.S. at 63, admission of the statement of an unavailable witness did not violate confrontation rights if the evidence fit within a firmly rooted hearsay exception or otherwise contained adequate indicia of reliability. The Confrontation Clause analysis was drastically altered with the United States Supreme Court's decision in *Crawford* and, subsequently, *Davis v. Washington*, 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006). The *Crawford* Court reasoned that the phrase "confronted with the witnesses" required historical and linguistic analysis of what the phrase meant and concluded: "It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 2 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically 'a solemn dec-

laration or affirmation made for the purpose of establishing or proving some fact.' [Citation omitted]." *Crawford,* 541 U.S. at 51. Hence, the Court concluded the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54.

The *Crawford* Court did not provide a comprehensive definition of what causes a statement to be "testimonial" for purposes of the Confrontation Clause. In fact, as the Court later noted, it "set forth 'various formulations' of the core class of 'testimonial' statements, but found it unnecessary to endorse any of them, because 'some statements qualify under any definition.' [Citation omitted.]" *Davis,* 547 U.S. at 822; see *Crawford,* 541 U.S. at 53-54, 68; *State v. Davis,* 283 Kan. 569, 575-76, 158 P.3d 317 (2006). The statement at issue—the one which, according to the *Crawford* Court, would qualify as testimonial under any definition—was taken several hours after an incident and while the individual giving the statement was herself in custody and *Mirandized.*

The Court did make wider-ranging statements that this and other courts have attempted to use to determine if statements made in other factual situations are testimonial. The Court mentioned at least two strands of analysis. First, the Court listed several "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Crawford,* 541 U.S. at 51-52. Two characteristics define these examples: (1) formality and (2) generally, in a criminal context, a law enforcement officer or other governmental official was the witness to the statement, if not the interrogator. Some courts and commentators have separated these two characteristics into separate tests: the first being whether the statement has a resemblance to the formality inherent in the types of "testimony" listed, and the second being whether the testimony resulted from "official inducement," in other words, when government officials "shape the statement into accusatorial form for evidentiary use at trial." 30A Wright & Graham, Federal Practice and Procedure § 6371.2, pp. 43-44 (2007 Supp.). Regarding the official inducement consideration, some statements in *Crawford* seem to imply that a gov-

ernmental actor must be involved for a statement to be testimonial. For example, the Court stated that an "off-hand, overheard remark . . . bears little resemblance to the civil-law abuses the Confrontation Clause targeted." 541 U.S. at 51. In noting that not all hearsay "implicates the Sixth Amendment's core concerns," the Court stated: "An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted." 541 U.S. at 51; see 30A Wright & Graham, Federal Practice and Procedure § 6371.3, pp. 200-03 (2007 Supp.).

In the second strand of analysis, the Court focused upon the intent of the person making the statement, referring to testimonial statements as those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 52.

The Court then melded the two strands of analysis, referring to " 'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' " 541 U.S. at 51. Where these tests are met and, thus, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U.S. at 68-69.

Subsequently, in *State v. Lackey*, 280 Kan. 190, 201, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006), this court focused on the declarant's intent to hold that an officer's interview with a witness conducted during the police investigation resulted in a testimonial statement because "an objective witness would think [it] would be used for trial and could arguably be construed as a police interrogation."

Two years after *Crawford*, the United States Supreme Court revisited the *Crawford* testimonial analysis in *Davis*, 547 U.S. 813. *Davis* actually involved two consolidated cases: *Davis v. Washington* and *Hammon v. Indiana*. Through the facts presented in *Davis*, the Court considered the admissibility of a victim's 911 call and

concluded those statements were not testimonial. 547 U.S. at 826-28. Through the facts of *Hammon*, the Court considered statements made to officers at a victim's home and concluded the statements were testimonial. 547 U.S. at 829-32.

In analyzing why different conclusions were justified, the Court clarified that the Confrontation Clause applies only to testimonial hearsay, stating: "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." 547 U.S. at 821. The Court determined that the text of the Sixth Amendment—the right "to be confronted with the witnesses against him"—created "[a] limitation so clearly reflected in the text of the constitutional provision [that it] must fairly be said to mark out not merely its 'core,' but its perimeter." 547 U.S. at 824. Once again, however, the Court refrained from giving precise boundaries to this perimeter, expressly declining to provide a comprehensive definition of "testimonial statements." 547 U.S. at 822, 830-31 n.5.

Instead, the *Davis* Court first limited the holding in *Crawford*, explaining the classification of the police interrogations that *Crawford* had in mind were limited to the facts of the "case [then] before us"—that is, a police interrogation "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." 547 U.S. at 826. The temporal aspect is repeated throughout the opinion, culminating in the Court making it a part of the test for determining whether statements are "testimonial" under the circumstances of the cases:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822.

Factors mentioned in this conclusion included (1) involvement of police; (2) interrogation (although in a footnote the Court indicated the holding could extend beyond "interrogations" [547 U.S.

at 822 n.1]); and (3) the objective purpose of the interrogation. These factors were given more emphasis than in *Crawford* and, arguably, at least some were new considerations. In a later part of the decision, as part of a response to Justice Thomas' dissent, the majority returned to another *Crawford* factor, stating that "[w]e do not dispute that formality is indeed essential to testimonial utterance." 547 U.S. at 831 n.5. The Court stated:

"What we called the 'striking resemblance' of the *Crawford* statement to civil-law *ex parte* examinations, [citation omitted], is shared by [the] statement here. Both declarants were actively separated from the defendant . . . . Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." 547 U.S. at 830.

In a footnote, the Court seems to define the level of necessary formality by stating: "It imports sufficient formality, in our view, that lies to such officers are criminal offenses." 547 U.S. at 831 n.5.

The *Davis* decision creates an ambiguity about the role (and perhaps the continued viability) of another factor, the declarant's objective intent. While the declarant's intent is frequently referenced in *Crawford*, the *Davis* Court vacillated on this point. At some points in the discussion, the *Davis* Court indicated it is the purpose of the declarant that counts: "[E]ven when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." 547 U.S. at 823 n.1. Yet, in other passages there are indications that the interrogator's intent is determinative. For example, the Court stated: "A 911 call . . . at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." 547 U.S. at 827.

We attempted to synthesize these different statements in *State v. Henderson*, 284 Kan. 267, 160 P.3d 776 (2007). *Henderson* dealt with the interview of a 3-year-old victim by a social worker from

Child Protective Services of the Kansas Department of Social and Rehabilitation Services and a police detective. We concluded the interview resulted in a testimonial statement even though the 3-year-old declarant may not have known the potential prosecutorial purposes of the interview. This holding was based upon an analysis that *Davis* focused upon the primary purpose of the interview as measured by an objective totality of the circumstances test including the nature of the officials involved. *Henderson,* 284 Kan. at 281-89. We concluded, however, that *Davis* did not erase consideration of the declarant's state of mind and considered it as a component of the totality of the circumstances. We cited the following as being relevant to the determination of whether a statement is testimonial: "(1) whether the declarant was speaking about events as they were actually happening, instead of describing past events; (2) whether the declarant made the statement while in immediate danger, *i.e.*, during an ongoing emergency; (3) whether the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and (4) the level of formality of the statement." *Henderson,* 284 Kan. at 278-79 (citing *Davis,* 547 U.S. at 828-30).

The factor stressed in *Henderson*, because we perceived it to be stressed in *Davis*, was the primary purpose of the interview. Examining the purpose of the interview at issue in this case leads to an obvious result: when Hunt addressed the bystander, he was checking on the bystander's welfare rather than seeking facts about the crime.

This conclusion raises another consideration: Is the involvement of police or other government officials a critical factor? In other words, do the holdings in *Crawford* and *Davis* require an "official inducement" for a statement to be testimonial? This question arises, in part, because the *Davis* Court deflects exclusive reliance on law enforcement inducement, indicating that neither *Crawford* nor *Davis* decided "whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " *Davis,* 547 U.S. at 823 n.2. At another point, the *Davis* Court stated it was unnecessary to consider whether and when statements made to someone other than law enforcement personnel are testimonial.

The Court again mentioned that the question was left open: "We have acknowledged that our holding is not an 'exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation.' " 547 U.S. at 830-31 n.5.

However, rather than distinguishing statements made to nonofficials from those made to officials, there is some indication these passages are meant to distinguish official inducement from the subset of law enforcement inducement. The specter of this possible distinction arises from other passages in the decision. Notably, after limiting the holding of *Crawford* to the context of police interrogation, the Court observed that this limitation avoided secondary definitional problems related to the universe of "interrogations" and justified a similar limitation of the holding in *Davis* because "these cases require us to determine more precisely which police . interrogations produce testimony." 547 U.S. at 822. The Court also avoided the broader question of statements made to someone other than law enforcement (nonpolice interrogations) by assuming that 911 operators were law enforcement officers, stating: "If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be the acts of the police." 547 U.S. at 823 n.2. Consistent with these limitations, in stating its holding, the *Davis* Court carefully limited the scope to police interrogations: "Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases . . . ." 547 U.S. at 822.

Hence, while it is clear that the Court left open the question of whether statements made to government officials other than law enforcement are testimonial, it is not clear that the Court intended to leave open the question of whether statements made to nonofficials can be testimonial. Rather, there are indications that the Court intended to exclude private or casual conversations from the definition of testimonial statements. This distinction is significant

in this case because the statements at issue were made to Hunt, a nonofficial, and the distinction raises the possibility we could categorically exclude from Confrontation Clause analysis all statements made to nonofficials. If so, the bystander's statements to Hunt would not raise a constitutional issue.

As already discussed, there are several statements in *Crawford* regarding "casual remarks to an acquaintance" in which the Court repeatedly indicated these casual comments bore little resemblance to the civil-law abuses the Confrontation Clause targeted. 541 U.S. at 51. Perhaps most notable, when the Court in *Crawford* defined the Confrontation Clause's phrase "giving witness against someone," the Court indicated this meant giving "testimony" and concluded the discussion by stating: "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51. Similarly, the Court in *Davis* contrasted casual statements to the formality of statements made to a governmental official which are testimonial. 547 U.S. at 824. Finally, the Court cited *Roberts*-era cases it said were consistent with *Crawford*, specifically stating that *Bourjaily v. United States*, 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987), and *Dutton v. Evans*, 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970), involved statements (to a wired informant and to a cellmate, respectively) that were clearly nontestimonial. The citation to these cases, particularly *Dutton*, "lends some support to the categorical treatment of 'private conversations' " as nontestimonial. 30A, Wright & Graham, Federal Practice and Procedure § 6371.3, p. 211 (2007 Supp.).

At a minimum, these passages indicate that there remains an open question as to whether the United States Supreme Court categorically excludes from the definition of testimonial any statement made to someone who is not a government official. Relying upon one or more of these passages from *Crawford* and *Davis*, several other courts have concluded private conversations—those not induced by an official—are categorically nontestimonial. See, *e.g., State v. Staten*, 364 S.C. 7, 22-32, 610 S.E.2d 823 (Ct. App. 2005), *vacated in part* 374 S.C. 9, 647 S.E.2d 207 (2007) (collecting

and discussing nontestimonial cases). Our court has not adopted such a categorical holding, however. We confronted the issue in our recent decision of *State v. Miller*, 284 Kan. 682, 709-13, 163 P.3d 267 (2007), and applied various considerations discussed in *Crawford* and *Davis* after noting that the explanation regarding testimonial statements in *Davis* was of limited applicability where the hearsay statements at issue were not made to law enforcement officers. The statements at issue in *Miller* were made by the defendant's former lover (Parb) by another woman (Cuthbertson) who became involved with the defendant after his wife's murder. The statements, made at Parb's residence, involved both Parb's and Cuthbertson's involvement with the defendant.

We concluded Cuthbertson's statements were not testimonial. 284 Kan. at 713. We applied the test from *Crawford* to determine whether the statements were made " 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " 284 Kan. at 713 (quoting *Crawford*, 541 U.S. at 52). To make this determination we examined factors discussed in *Crawford* and *Davis*, noting the statements were not (1) made in the presence of police officers or other authorities and (2) subject to any of the formalities and procedures otherwise associated with testimonial hearsay but were the result of a very emotional conversation between the two women. 284 Kan. at 713; see *Crawford*, 541 U.S. at 68 (explaining that testimonial hearsay applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police investigations").

In *Miller*, we did not engage in a discussion of whether *Davis* exempts from a Confrontation Clause analysis any statement which is not made to or induced by a government official. Nor do we resolve that issue today. We have discussed the issue in order to point out the possibility we may eventually reach such a conclusion and to clarify that we are not definitively holding that all hearsay statements, in particular those hearsay statements that do not involve government officials, may be testimonial.

In light of the ambiguities and uncertainties of the *Crawford* and *Davis* decisions, the unsettled nature of the case law, and the

continuing debate between members of the United States Supreme Court and among legal scholars as to the efficacy of the testimonial standard and as to what test formulation best determines when that standard has been met, we will continue to approach the issue broadly under the possibility that the Supreme Court may intend for conversations between a declarant and a non-official to be testimonial if other aspects of the test stated in the decisions are met.

Thus, we are left once again to attempt to synthesize what aspects of *Crawford* and *Davis* might be considered. In light of the *Crawford* rule that testimonial out-of-court statements offered for the truth of the matter asserted cannot be used against a criminal defendant unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant, the various factors considered in *Crawford, Davis, Henderson,* and *Miller* for determining whether a hearsay statement is testimonial include:

(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime?

(2) Was the statement made to a law enforcement officer or to another government official?

(3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether

(a) the declarant was speaking about events as they were actually happening, instead of describing past events;

(b) the statement was made while the declarant was in immediate danger, *i.e.,* during an ongoing emergency;

(c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and

(d) the interview was part of a governmental investigation?; and

(4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.,* was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?

As to the first inquiry, when stated in terms of this case: Would an objective witness reasonably believe such statements would be available for use in the later prosecution of a crime when the totality of the circumstances indicate that the statements were made by an unidentified emotional bystander to another bystander

shortly after the shooting at the scene of a crime where there were approximately 200 other bystanders? The answer to this question is "No." The statements were made to Hunt by an unidentified emotional declarant, not to police officers. Although police officers were presumably nearby, the evidence does not show that the statements were made within earshot of police officers or other authorities. In fact, the statements were at least three layers of communication away from being used at a later trial: the statements of the "they" that spoke to Cooper's cousin, Cooper's cousin who spoke to Hunt, and Hunt who spoke to the police. With approximately 200 people around, an objective witness would not reasonably conclude that the statements made at the scene would be "available for use at a later trial." See *Crawford*, 541 U.S. at 52.

Regarding the second inquiry, clearly the statements were not made to a law enforcement officer or other government official. Even under an expansive reading of the facts, there is no indication that Hunt was working as an agent or conduit for the police.

Third, the purpose of the inquiry was merely to check on the bystander, not to investigate the crime. Additionally, the bystander was clearly shaken by the events and the scene, obviating any implication that Hunt's inquiry was to accuse for purposes of criminal prosecution. We note that some courts have held that excited utterances are per se nontestimonial. See, *e.g., United States v. Hadley*, 431 F.3d 484, 503-06 (6th Cir. 2005) (collecting cases). A more reasoned approach in light of the *Davis* Court's eschewing of hearsay rules as the standard for Confrontation Clause analysis (with the possible exception of dying declarations, see *Crawford*, 541 U.S. at 56 n.6) is to recognize that even an excited utterance could be testimonial if made in response to police interrogation. *Samarron v. State*, 150 S.W.3d 701, 706-07 (Tex. App. 2004). In this case, however, the circumstances weigh toward a conclusion that the statement, although accusatory, was not made with that purpose in mind. See 30A Wright & Graham, Federal Practice and Procedure § 6371.2, p. 42 (2007 Supp.) (suggesting that better reasoned approach would have been for the Court to use "accusation" test rather than "testimonial" test). The inquiry was to resolve a current emergency; Hunt testified, "[The other bystander] was in distress

and I asked him what was wrong." Also, with regard to the temporal aspects, although the statements were made about a past crime, the statements were made while police and paramedics were trying to deal with the emergency at hand and while the declarant was dealing with the excitement of the events.

Finally, this emotional conversation between two men at the scene of a shooting was not subject to any of the formalities and procedures otherwise associated with testimonial hearsay. See *Davis*, 547 U.S. at 827-28; *Crawford*, 541 U.S. at 68.

Before leaving this topic, we note that Brown urges this court to adopt a "broad definition" of testimonial, citing *United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005) ("[W]e hold that a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime."), and *People v. Victors*, 353 Ill. App. 3d 801, 812, 819 N.E.2d 311 (2004) ("[D]epending on the context and circumstances of the case, testimonial evidence encompasses out-of-court statements that are offered to establish or disprove an element of the offense charged or a matter of fact.").

We reject Brown's invitation for several reasons. First, in raising this argument, Brown does not cite Kansas authority. Moreover, we note that both holdings are post-*Crawford* but pre-*Davis*. They offer no assistance in synthesizing the two decisions. Additionally, the cases are significant, or have the potential of being significant, enlargements of the *Crawford* and *Davis* factors. While *Crawford* addresses statements "made under circumstances which would lead an objective witness reasonably to believe that the statement *would be* available for *use at a later trial*," (emphasis added) 541 U.S. at 51-52, or for use "prosecutorially," 541 U.S. at 51, the Tenth Circuit Court of Appeals includes statements that *might* be used in the *investigation* of the crime. *Summers*, 414 F.3d at 1302. This might be the United States Supreme Court's intent when stating the test included statements that would be used prosecutorially, but that is not entirely clear. The Illinois test is even broader and seems to be more of a test for whether evidence addresses the truth of the matter asserted—*i.e.*, whether it is hearsay—than

whether it is testimonial which requires more than simply that the statement relates to an element of the crime. See *Victor*, 353 Ill. App. 3d at 811-12. Moreover, neither test advances nor provides clarity to the analysis beyond the guidance given in *Crawford* and *Davis*. We, therefore, decline to broaden the test.

We conclude that statements made by an unidentified emotional bystander to another bystander (Hunt) within minutes of a shooting, were not testimonial because the statements were not made under circumstances which would lead an objective witness to reasonably believe that the statements would be available for use at a later trial. Hunt did not intend to seek testimony, the statements were not made to a law enforcement officer or other government official, and the statements lacked the formality of testimony. Because the statements made to Hunt were not testimonial, they did not implicate Brown's rights under the Confrontation Clause. But, because the statements are hearsay, we must determine whether they are admissible under the requirements of the Kansas hearsay statutes. See *State v. Davis*, 283 Kan. 569, 575, 158 P.3d 317 (2006).

### 3. *Excited Utterance*

After the pretrial hearing, the trial court ruled that the bystander's statements were admissible under K.S.A. 60-460(d)(2), commonly referred to the excited utterance exception. Generally, this court reviews a trial court's determination that hearsay is admissible under a statutory exception, such as K.S.A. 60-460(d)(2), for an abuse of discretion. This standard includes a " ' "review to determine that the discretion was not guided by erroneous legal conclusions." ' [Citations omitted.]" *Davis*, 283 Kan. at 573. Simply put, the trial court's discretion must have been exercised in light of a correct understanding of the applicable law. 283 Kan. at 575.

Under the excited utterance provision of K.S.A. 60-460(d)(2), an event or condition must have occurred, the event must be sufficiently "startling" to show that the declarant perceived it, and the declarant must have made the statement while under stress of nervous excitement. *State v. Rowe*, 252 Kan. 243, 250, 843 P.2d 714 (1992); see Barbara, Kansas Rules of Evidence with Eviden-

tiary Objections and Evidentiary Foundations, § 7.6 (3d ed. 1993). The excited utterance exception has the " 'characteristic of spontaneity arising either from the reaction to contemporary perception or from the excitement which carries over from the event.' " *Rowe*, 252 Kan. at 248-49 (quoting 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460[d], p. 239 [1979]).

Brown first argues that the statements do not qualify as excited utterances because the unnamed declarant spoke to Hunt a "full five minutes after the shooting." He contends that this lapse of time took away any spontaneity the utterances might have had. We disagree.

This court has permitted statements given after lapses of time similar to the one in this case. See, *e.g.*, *State v. McCrady*, 152 Kan. 566, 106 P.2d 696 (1940) (in rape trial, testimony as to prosecutrix' statements concerning defendant's attack on her held admissible in view of her testimony warranting conclusion that period intervening between attack and such statements was less than 15 minutes and evidence that she was hysterical at time of making statements); *State v. Morrison*, 64 Kan. 669, 68 P. 48 (1902) (declaration by a person whose throat was cut and who was speechless, written within about 5 minutes after her assailant had been pulled away from her, that "J. killed me," was admissible). As one treatise author notes, in contrast to a present sense impression where the timing requirement is rigorous: "If the declarant is still excited or in pain, an excited utterance can be made hours after the event." Imwinkelried, Evidentiary Foundations, p. 352 (4th ed. 1998). Time is not the indicia of reliability underlying the excited utterance exception; rather the sense of excitement or stress that vitiates the opportunity for reflection makes the statement spontaneous and reliable.

Here, the declarant was clearly under the stress of nervous excitement caused by the very recent event. Cooper, the victim, was a family member; the declarant said he was a cousin. Further, the declarant was visibly tearful, distraught, and in a state of panic. As Hunt testified, Hunt and the declarant stood over Cooper's body and observed blood and biological matter around his head. It would have been a distressing scene. There is nothing, including the lapse

of time, that would indicate the statements were anything but spontaneous. The statements made by the declarant bystander that did not include another level of hearsay were admissible under the excited utterance exception of K.S.A. 60-460(d)(2).

Next, Brown relies on his contention that the statement "They said Lovey shot him" constituted double hearsay and argues that a foundation was not laid to meet the excited utterance exception because there is no way of knowing if the original declarant (the person who spoke to the bystander who spoke to Hunt) personally perceived the shooting or suffered nervous excitement. On this ground, Brown's assertion is correct. There is no evidence in the record regarding the alleged original declarant or the context in which the statement might have been made to the person who eventually spoke to Hunt, and admission of the statement was error.

The admission of the statement was not necessarily reversible error, however. K.S.A. 60-261 provides that an error in the admission of evidence will not be grounds for reversing a conviction unless affirming the conviction is "inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

Under the facts of this case, the admission of the statement identifying the shooter as "Lovey" was harmless. The statement was cumulative to the testimony of several other witnesses who identified Brown as the shooter, including that of Berry, Hunt, and Devon Brown. These witnesses variously identified Brown by photographic lineup and by name, and both Devon and Officer Espinoza testified Brown was nicknamed "Lovey." Moreover, Brown confessed to committing the crime. Thus, the erroneous admission of the evidence was harmless.

### 4. Gang Affiliation

Next, Brown argues that the trial court abused its discretion by allowing the State to introduce evidence of his gang affiliation as motivation for the shooting. Arguing that the State failed to sufficiently prove the charged crime was related to gang activity, Brown

contends the gang evidence was irrelevant and that its admission violated his rights to due process and a fair trial. Brown's arguments have no merit.

Before trial, the State filed a motion to introduce evidence of Brown, Cooper, and other witnesses' gang affiliation to show motive for an otherwise inexplicable act. At a hearing on that motion, Brown objected to the admission of such evidence because of its prejudicial nature. Brown also filed a pretrial motion in limine seeking to exclude gang evidence, arguing there was no evidence that the crime was gang related and that gang evidence would prejudice the jury and deny him a fair trial.

The trial court ultimately ruled that the gang evidence was relevant and admissible to show a motive for what would otherwise be an inexplicable act.

Standard of Review

With regard to examining the relevance of gang evidence, we apply the following standard of review:

"A determination of relevance is the first step in analyzing if evidence is admissible. Unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. [Citations omitted.] Because relevancy is a matter of logic and experience, the determination of relevancy is generally seen as inherently discretionary. [Citation omitted.] However, a trial court's discretion must be guided by the considerations imposed by prior case law and by the rules of evidence. [Citation omitted.]" *State v. Goodson*, 281 Kan. 913, 922, 135 P.3d 1116 (2006).

The first inquiry, then, is whether the evidence is relevant. As a general rule, gang affiliation evidence is admissible if relevant. *State v. Conway*, 284 Kan. 37, 47, 159 P.3d 917 (2007); *State v. Ross*, 280 Kan. 878, 885, 127 P.3d 249 (2006). " 'Relevant evidence' " means "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). "Materiality requires that the fact proved be significant under the substantive law of the case and properly at issue," and although an evidentiary fact may be "relevant under the rules of logic, it is not material unless it has a legitimate and effective bearing on the decision of the ultimate facts in issue." *Goodson*, 281 Kan. 913, Syl. ¶ 7. Inherent in these

requirements is the necessity that there be proof that gang affili-
ation or gang activity is related to the crime charged. 281 Kan. 913,
Syl. ¶ 9; *State v. Winston*, 281 Kan. 1114, 1125, 135 P.3d 1072
(2006).

Evidence that a defendant is a gang member or is associated
with gang-related activity "may be material and, therefore, relevant
when the evidence provides a motive for an otherwise inexplicable
act, forms a part of the events surrounding the commission of the
crime, or shows witness bias." 281 Kan. at 922; see also *State v.
Jamison*, 269 Kan. 564, 568, 7 P.3d 1204 (2000) (evidence of gang
affiliation relevant to establish motive for shooting).

Brown argues that the gang evidence in the present case does
not fit into any of these categories, in large part because there was
not sufficient evidence that the crime was gang related. Brown
likens this case to *State v. Lietner*, 272 Kan. 398, 415-18, 34 P.3d
42 (2001), where this court held that evidence of Lietner's partic-
ipation in witchcraft was lacking in probative value and prejudicial
to her; however, other overwhelming evidence prevented its er-
roneous admission from constituting reversible error. Other trial
evidence showed that Lietner had shot her ex-husband once in the
back of the head and twice more in the temple out of frustration
from their divorce, fear of physical abuse, and need for his life
insurance proceeds. In *Lietner*, the record contained not even a
hint or innuendo that her abstract beliefs had any connection to
the killing. Brown argues that the gang evidence in this case is
similar to the inadmissible evidence in *Lietner* because it raised
the "possibility" that the jurors would develop a dislike or fear of
the defendant. Simply put, Brown contends that the evidence
served only to prejudice the jurors against him. What he ignores,
however, is that, unlike *Lietner*, the record in this case contains
connections between the gang evidence and the shooting which
give a motive for what would be an otherwise inexplicable act.

This case is more similar to *State v. Tatum*, 281 Kan. 1098, 135
P.3d 1088 (2001), and *State v. Gholston*, 272 Kan. 601, 35 P.3d
868 (2001), *cert. denied* 536 U.S. 963 (2002). In *Tatum*, Damon
Walls, his girlfriend Kyea Kimbrough, and his friend Terrell Wil-
liams drove to Dwayne Coates' house in Kansas City, Kansas, to

purchase marijuana. The buy had been prearranged. When they arrived at Coates' house, Walls parked the car and Williams got out. As Williams walked up to the house, Walls' car was hit by a barrage of gunfire. Walls and Kimbrough both received multiple gunshot wounds. Walls survived, but Kimbrough died. Chatha Tatum and Charles Winston were eventually identified as the shooters. The State's theory of the case was that the shooting was gang related in that it arose out of an ongoing conflict between two rival Kansas City, Missouri, gangs.

In Tatum's appeal, he argued there was insufficient evidence that he was a gang member and that the crime was gang related. The *Tatum* court distinguished cases in which there was no evidence of gang motivation or of gang membership, *e.g.*, *State v. Cox*, 258 Kan. 557, 908 P.2d 603 (1995), and *State v. Pham*, 27 Kan. App. 2d 996, 10 P.3d 780 (2000). The court noted that Tatum's gang association was established and there was abundant evidence suggesting the motivation for the *Tatum* shooting was gang related. At a separate incident at Oak Park Mall, Tatum and Winston, acting together, referenced the prior gang-related murder of Walls' brother "Messy Marvin" and made a veiled threat that Walls would soon be facing the same fate. Then, just several months later, Walls was shot at in a gang-style ambush attack, and the shooters were identified as Tatum and Winston. The *Tatum* court characterized the mall incident was pivotal by, *inter alia*, suggesting the gang-related motivation for the crime.

In *Gholston*, the defendant was charged with premeditated first-degree murder for firing a semiautomatic weapon into a parked car and killing a 2-year-old girl. The trial court permitted the prosecution, over defense counsel's objection, to introduce evidence of Gholston's membership in the Neighborhood Crips gang and that one of the individuals in the car with the girl at the time of the incident was a member of the Second Street rival gang. On appeal, this court affirmed, rejecting Gholston's argument that the trial court's failure to give a limiting instruction was clearly erroneous and determining that evidence of gang membership provided motive for an otherwise inexplicable act. 272 Kan. at 615.

In the present case, like *Tatum* and *Gholston*, evidence of gang membership was relevant and admissible. Officer Espinoza's expert testimony explained gang characteristics and gang member identifiers. He identified Brown as a Junior Boy, in the Hill Block subset, and the victim as a member of the rival Bloods gang. And Cole, the individual with whom Cooper had an altercation before the shooting, was also a Junior Boy in the Second Street subset. In addition, evidence was presented of several incidents of violence between these rival gangs, the Bloods and the Junior Boys.

Although Brown complains only about Officer Espinoza's testimony, other witnesses also testified regarding gang affiliation. Cooper's girlfriend Arnold testified that she knew Cole was a "Second Streeter" or Junior Boy. She also testified that victim Cooper was a Blood. Arnold stated that the two men whom Cole chased with a gun in front of Arnold's car "associated with" Cooper. Testifying that she did not know if the two were actually members of the Bloods gang, Arnold stated, "[B]ut . . . they were around Bloods a lot." Cooper saw Cole chasing the two associates and got out of Arnold's car to stop the altercation. According to Arnold, she saw Brown and Cole together right before the fight broke out.

Although Brown denied being a current gang member when testifying in his own defense at trial and admitted only to hanging out with Hill Blocks, Brown himself told the officers during his interrogation that he was a Hill Block and a "baby Junior Boy."

Thus, evidence of gang affiliation clearly provided motive for the shooting death of Cooper, an otherwise inexplicable act. Further, while this court has acknowledged that such gang affiliation evidence may also be prejudicial to the defendant, the prejudicial effect of the such evidence may be cured by a limiting jury instruction. See *Ross*, 280 Kan. at 887-88 (concluding that limiting instruction cured prejudicial effect of admitting evidence that defendant and one of defendant's witnesses were members of the same gang). But see *Conway*, 284 Kan. at 51 (trial court is not required to *sua sponte* give limiting instruction regarding gang evidence). We note that the trial court gave a limiting instruction in this case.

Admitting the gang evidence was not error.

## 5. *Heat of Passion Voluntary Manslaughter Instruction*

Next, Brown contends the trial court erred by refusing defense counsel's request to instruct the jury on voluntary manslaughter as a lesser included offense. This contention lacks merit.

As a general rule concerning lesser included offenses:

" 'A trial court must instruct the jury on a lesser included offense "where there is some evidence which would reasonably justify a conviction" of the lesser offense. [Citation omitted.] "If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive." [Citation omitted.] . . . "However, the duty to so instruct arises only where there is evidence supporting the lesser crime." [Citation omitted.] An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented.' [Citation omitted.]" *State v. Boyd*, 281 Kan. 70, 93, 127 P.3d 998 (2006) (quoting *State v. Drennan*, 278 Kan. 704, 712-13, 101 P.3d 1218 [2004]).

Brown suggests that a voluntary manslaughter instruction was warranted because the shooting of Cooper (allegedly by Brown) "was not separated either in time or space from the argument [Cooper] had with Terrell Cole." He argues that because of "bad blood" between the rival gangs, "[i]t belies the State's theory of motive to argue now that the fight between Cole and Cooper was not sufficient provocation for Mr. Brown." This theory does not comport with Kansas law.

K.S.A. 21-3403 defines voluntary manslaughter as "the intentional killing of a human being committed: . . . (a) [u]pon a sudden quarrel or in the heat of passion." To prove "heat of passion" voluntary manslaughter, a killing must be intentional and there must have been legally sufficient provocation. *State v. Cheeks*, 258 Kan. 581, 590, 908 P.2d 175 (1995). The test of the sufficiency of the provocation is objective, not subjective. We have said: " ' "The provocation, whether it be 'sudden quarrel' or some other form of provocation, must be sufficient to cause an ordinary [person] to lose control of his [or her] actions and his [or her] reason." ' [Citation omitted.]" *State v. Moncla*, 262 Kan. 58, 74, 936 P.2d 727 (1997); see also *State v. Hill*, 242 Kan. 68, 74, 744 P.2d 1228 (1987) (" 'Such emotional state of mind [heat of passion] must be of such

a degree as would cause an ordinary man to act on impulse without reflection.' "). Such provocation must be more than mere words or gestures, and if assault or battery is involved, the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. *State v. McClanahan*, 254 Kan. 104, 114, 865 P.2d 1021 (1993). Additionally, this court has held that a defendant was not entitled to the voluntary manslaughter instruction when the defendant " 'interjected' " himself or herself into the situation. See *State v. Hays*, 270 Kan. 535, 542, 17 P.3d 317 (2001). Likewise, this court has held that a voluntary manslaughter instruction was not warranted where, absent prior bad blood between the defendant and the victim or evidence of any prior argument, the evidence failed to establish adequate provocation to require the instruction. *McClanahan*, 254 Kan. at 115-16.

The evidence at trial showed that an altercation erupted between Cooper and Cole, not Brown. By some accounts the altercation was verbal; by no account was the altercation one which would have placed Brown in reasonable belief that he was in danger of great bodily harm or at risk of death. Additionally, there was no evidence of personal animosity between Brown and Cooper, the victim.

The trial court did not err by refusing to instruct the jury on "heat of passion" voluntary manslaughter.

### 6. *Third-Party Evidence Rule*

In Brown's supplemental brief, he argues the trial court denied his right to present a defense by denying his requests to introduce evidence of a third-party's guilt. He specifically complains about the court's refusal to permit evidence that (1) an individual named Brian Walker, with an allegedly similar physical description to Brown and allegedly similar motive, was involved in a fight at the scene of the killing; (2) an individual named Derrick Hubbard was also involved in a fight at the scene and had a similar physical description to Brown; (3) a police officer stopped individuals named Adrian Patterson and Joseph Nelson leaving the scene of the shooting with the lights of their vehicle turned off; (4) another officer received a telephone call from an individual who said the

police had the wrong person in custody for the shooting; and (5) hearsay evidence that a woman named Monique Jackson contacted law enforcement and told them a man named Ronald "Napoleon" James called her around the time of the shooting and told her he had just shot someone in the head in "Old Town."

Standard of Review

A trial court's decision under the third-party evidence rule at the heart of the evidentiary question before us here is subject to an abuse of discretion standard of review on appeal. See *State v. Marsh (Marsh I)*, 278 Kan. 520, 531, 102 P.3d 445 (2004), *rev'd on other grounds Kansas v. Marsh*, 548 U.S. 163, 165 L. Ed. 2d 429, 126 S. Ct. 2516 (2006). This standard of review places the burden of proof on appeal on the party alleging that such an abuse of discretion occurred. *State v. Scott-Herring*, 284 Kan. 172, 176, 159 P.3d 1028 (2007); *State v. Trotter*, 280 Kan. 800, 810, 127 P.3d 972 (2006). The trial court's decision may be an abuse of discretion if the decision does not rest on considerations imposed by prior case law. *Goodson*, 281 Kan. at 922.

This court recently clarified the law relating to the third-party evidence rule in *Marsh I*, 278 Kan. 520, and *State v. Adams*, 280 Kan. 494, 505, 124 P.3d 19 (2005). Since *Adams*, the United States Supreme Court reversed *Marsh I*'s holding striking down Kansas' death penalty statute, see *Kansas v. Marsh*, 548 U.S. 163, but that portion of *Marsh I* clarifying the third-party evidence rule was not subject to review and remains good law.

In *Marsh I*, this court held that "while evidence of the motive of a third party to commit the crime, standing alone, is not relevant, such evidence may be relevant if there is other evidence connecting the third party to the crime." 278 Kan. at 530. This is also because

"evidence of a third person's motive alone would not have any tendency to prove a material fact, but instead would serve to 'confuse the jury, to permit [jurors] to indulge in speculations on collateral matters wholly devoid of probative value relative to who committed the [crime] and to divert their attention from the main issue they were sworn to try.' [Citation omitted.]" 278 Kan. at 530-31.

The *Adams* court reiterated:

"[In *Marsh I*] [w]e made clear that admission of third-party evidence did not turn on the sometimes hazy distinction between direct and circumstantial evidence. Rather, we said, a district judge must evaluate the totality of facts and circumstances in a given case to determine whether the defense's proffered evidence effectively connects the third party to the crime charged. [Citation omitted.]" 280 Kan. at 505.

The *Adams* court then summarized recent cases on this issue. See 280 Kan. at 505-06. In *Marsh I*, the defendant was accused of killing two victims, but there was also evidence that the husband and father of the victims might have been involved. The *Marsh I* court found the defendant had proffered more than mere evidence that the husband had a motive, in part because there was evidence that there was a mixture of the husband's blood and blood from one of the victim's on the defendant's shoes. As a result, the court held that Marsh's right to a fair trial had been violated by the trial court's exclusion of the third-party evidence. 278 Kan. at 533.

In *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003), the defendant tried to admit evidence that another person was seen holding the murder weapon immediately after the fatal shot was fired. There was also evidence that a third party admitted to the shooting and later dumped the body. This court held that the trial court erred in not admitting the third-party evidence. 275 Kan. at 97, 101, 106.

This court reached a different result in *State v. Hooker*, 271 Kan. 52, 21 P.3d 964 (2001). In that case, the State presented evidence that the defendant broke into the residence of the victim and his girlfriend, asked about money, struggled with the victim, and shot him in the back. A burgundy Cadillac had been seen in the parking lot at the time of the shooting; 3 days later, the girlfriend of the victim saw a burgundy Cadillac at a gas station and recognized the defendant as the man who had broken in and shot her boyfriend. She wrote down the license plate number and called the police, who picked up the defendant later that day.

In response, Hooker sought to introduce evidence that two other individuals had threatened the victim. He conceded that the proffered evidence was hearsay based on rumors. The *Hooker* court held the evidence was irrelevant in the absence of other evidence

to connect either of the two persons to the victim's death. 271 Kan. at 65-66.

Finally, in *Adams*, the defendant was charged with the death of a small child in a shaken baby scenario. Adams tried to admit evidence that the child's mother had abused one of her daughters from a previous marriage and the divorce decree from that marriage gave her only supervised visits with the children. Adams was trying to use this evidence in conjunction with evidence that the mother had been seen acting aggressively towards the child in the weeks before the death to prove she was actually the cause of the child's death. This court determined that this was more like *Hooker* than *Marsh I* or *Evans* in that none of the evidence proffered by Adams could place the mother at the crime scene at the time relevant to the child's injuries or death. 280 Kan. at 506-07. Without such evidence, the *Adams* court found that the defendant's "effort to pin blame on [the mother] amounted to baseless innuendo. In such a situation, the district judge's decision to exclude [the evidence] did not qualify as an abuse of discretion." 280 Kan. at 507.

Brown's case is more like *Hooker* and *Adams* than *Marsh I* and *Evans*. Some of the evidence proffered by Brown was pure hearsay. And none of the evidence offered by Brown amounted to anything more than baseless innuendo. There is nothing tying these third parties to the shooting. The closest possible third-party connection is Adrian Patterson in that Brown, at one point, told officers that Patterson was the shooter. This connection was dispelled by Brown himself, however, when he admitted to police he shot Cooper.

Under the circumstances, the trial court did not abuse its discretion by excluding evidence of third-party guilt.

### 7. *Cumulative Error*

Finally, Brown argues that cumulative trial errors deprived him of a fair trial. This contention has no merit.

This court applies the following test to a claim of cumulative trial errors:

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied [the defendant]

a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Holmes*, 278 Kan. 603, 641, 102 P.3d, 406 (2004)." *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 383 (2006).

Because multiple errors have not been found, the cumulative error doctrine is simply not applicable.

Affirmed.

DAVIS, J., not participating.

GREENE, J., assigned.