IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,046

STATE OF KANSAS,
*Appellee*,

v.

DAVID DARREL WILLIAMS,
*Appellant.*

SYLLABUS BY THE COURT

1.

An appellate court employs an unlimited standard of review when addressing whether a defendant's right to confront witnesses under the Sixth Amendment to the United States Constitution has been violated.

2.

The Confrontation Clause applies to testimonial statements and prohibits the admission of such statements by a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.

3.

Two statements of an informant during a controlled law enforcement drug buy supporting the prosecution of the defendant in this case, recorded and played for the jury, were testimonial. Their content reinforced evidence of the identity of the seller and the substance purchased; it was not limited to context. The circumstances surrounding the statements also supported their testimonial nature.

1

4.

Admission of two testimonial statements by an informant without providing the defendant an opportunity to cross-examine the informant was error in this case, but it was harmless.

Review of the judgment of the Court of Appeals in an unpublished opinion filed September 18, 2015. Appeal from Ellis District Court; EDWARD E. BOUKER, judge. Opinion filed April 21, 2017. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and *Johnathan M. Grube*, of the same office, was on the brief for appellant.

*Amanda G. Voth*, assistant solicitor general, argued the cause, and *Thomas J. Drees*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This appeal requires this court to decide whether an audio recording of a nontestifying informant's statements can be admitted into evidence in a criminal trial without violating the defendant's right to confront witnesses under the Sixth Amendment to the United States Constitution and *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The Court of Appeals rejected the defense argument against admission and affirmed defendant David Darrel Williams' conviction for distribution of methamphetamine. We accepted Williams' petition for review to address the Confrontation Clause issue.

Williams also raises a challenge to his sentence, arguing that his prior convictions could not be used to enhance his sentence without those convictions being proved to a jury beyond a reasonable doubt, relying on *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). He concedes that we have consistently rejected this argument, see, *e.g.*, *State v. Ivory*, 273 Kan. 44, 47, 41 P.3d 781 (2002). We do so again today, and no further discussion of this challenge is necessary.

As detailed below, we affirm the decision of the Court of Appeals and the judgment of the district court because the error in admitting the informant's statements was harmless.

## FACTUAL AND PROCEDURAL BACKGROUND

About dusk on September 13, 2012, KBI Special Agent Michael Lind met with a confidential informant to set up a purchase of methamphetamine from Williams. The informant arranged a meeting with Williams during a telephone call in which Williams gave the informant directions to his location. After the call, Lind drove with the informant to meet Williams.

As Lind and the informant reached the meeting place, Williams walked out to the sidewalk. Lind stopped the car, and Williams got into the back passenger seat. Williams asked if Lind and the informant "wanted a line." At trial, Lind would testify that this "could mean a line of methamphetamine, as a way of ingesting the drugs."

At that point, Williams asked Lind to drive to another location. Lind did so. Williams then removed a small plastic baggie from his pocket and placed it on the center console. Lind picked the bag up and examined it, attempting to determine whether it

3

contained drugs and, if so, in the correct quantity. Satisfied that the bag contained what he was looking for, Lind paid Williams $120 of "Drug Enforcement Unit buy money."

Lind drove Williams back to where he had picked him up. After dropping Williams off, Lind drove to another location and conducted a field test on the substance in the baggie. The test confirmed that the substance was methamphetamine.

Williams would eventually be arrested and charged with distribution of methamphetamine in violation of K.S.A. 2015 Supp. 21-5705(a)(1).

At trial, Lind testified about the details of the buy. Lind identified Williams at trial as the person who had sold him the methamphetamine. Lind also described wearing a "body wire" to create an audio recording of the drug deal.

Although Lind's informant had been subpoenaed to testify at trial, she did not appear. Williams objected to the State playing the 4-minute audio recording of the deal for the jury, arguing that the statements of the informant that could be heard on the recording were testimonial and that playing them for the jury would violate his rights under the Sixth Amendment Confrontation Clause. Moreover, Williams argued at the time, the informant's statements did not satisfy any hearsay exception in Kansas statutes.

Williams specifically complained about two statements from the informant, which, he argued, identified him and the content of the baggie. Although it is difficult to hear on the recording included in the record on appeal, the parties seem to agree on the content of the first statement. It occurred when Williams got into the car, and the informant acknowledged him by saying, "'Say hi to Dave," or something similar. The second statement, which can be heard clearly on the recording in the record on appeal, was the

4

informant's response to Williams' request about whether Lind and the informant wanted "a line." The informant responded with one word: "meth."

The district court judge overruled the defense objection and allowed the entire recording to be played to the jury. The judge had concluded that there was no Confrontation Clause problem because the informant's statements did not qualify as testimonial. The judge said that the informant "had no idea that the tape was being made. She was not being questioned by law enforcement. She was not in the custody of law enforcement." The judge also had concluded that the statements satisfied Kansas' hearsay exception for vicarious admissions. See K.S.A. 2015 Supp. 60-460(i)(2) (vicarious admissions admissible when party, declarant participating in plan to commit crime).

In addition to Lind, Harold Riddle, a forensic chemist for the KBI, and Scott Braun, a detective with the Ellis County Sheriff's Department, testified at trial. Riddle had tested the substance Lind purchased from Williams and had confirmed that the substance was methamphetamine. Braun had provided security for Lind during the drug buy by monitoring the audio through Lind's body wire. Braun testified that he had identified Williams from hearing his voice during the drug transaction; he had previously heard Williams' voice on multiple occasions. After recognizing Williams from his voice, Braun requested that a photo of Williams be sent to his cell phone. After the controlled buy had concluded, Braun showed the photo of Williams to Lind. Braun testified that Lind confirmed Williams' identity from the photo.

A version of the first of the informant's two challenged statements was featured in the State's closing argument, when the prosecutor argued that the State had proved the distribution of drugs beyond a reasonable doubt:

5

"[W]e do have the evidence. We have the recording and you hear it.

"'Hi, Dave' at the beginning; 'Thanks, Dave' at the end. Talking about other distribution of drugs, 14 grams. This was not an accident. This was an intentional act on his part to distribute."

The jury found Williams guilty, and the district judge sentenced Williams to 49 months in prison, followed by 24 months' postrelease supervision.

Williams appealed to the Court of Appeals, arguing that application of four factors from *State v. Brown*, 285 Kan. 261, 291, 173 P.3d 612 (2007), demonstrated that the challenged informant's statements should be classified as testimonial: (1) an objective witness in the informant's position would reasonably believe his or her statements would later be available for use in the prosecution of a crime; (2) the statements were made in a car with an undercover law enforcement agent, in other words, to that agent; (3) the statements proved facts relevant to a later drug prosecution that was the primary purpose of the encounter, when the totality of the circumstances are viewed objectively; and (4) although the statements may have appeared to be informal to the defendant, they were, in fact, part of a planned scenario sufficiently formal to make them inherently testimonial. Williams also relied upon precedents from the United States Courts of Appeals for the Sixth and Seventh Circuits that held informants' statements to be testimonial and on an earlier Court of Appeals decision with a similar holding. See *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004); *United States v. Silva*, 380 F.3d 1018 (7th Cir. 2004); *State v. Adams*, 35 Kan. App. 2d 439, 131 P.3d 556 (2006), *rev'd on other grounds* 283 Kan. 365, 153 P.3d 512 (2007).

For its part, the State's Court of Appeals argument on whether the informant's challenged statements were testimonial was focused primarily on the *Brown* factors. It

did not address the Sixth and Seventh Circuit cases and attempted to distinguish the earlier Court of Appeals decision in *Adams*.

The panel in this case determined that the informant's statements were not testimonial "in nature under the circumstances presented. . . . [T]here is no evidence that the informant knew the drug transaction was being recorded. Likewise, the informant was not responding to questions from Agent Lind nor was she in custody at the time." *State v. Williams*, No. 111,046, 2015 WL 5458672, at *3 (Kan. App. 2015) (unpublished opinion). The panel observed that the informant apparently had not been granted immunity from prosecution, making her a coconspirator in the drug transaction; and it relied on this court's recognition that statements made in furtherance of a conspiracy are, categorically, nontestimonial. 2015 WL 5458672, at *3 (citing *State v. Betancourt*, 301 Kan. 282, 300-01, 342 P.3d 916 [2015]).

The panel also applied the multifactor *Brown* test. It regarded the result on the first factor as "unclear" because "the informant's statements were not made during a custodial interrogation, were not made to Agent Lind, and were not made in response to Agent Lind's questions," but "an objective person who is helping an undercover officer buy drugs might reasonably expect that any statements made during the transaction would be used in a later prosecution." *Williams*, 2015 WL 5458672, at *4. In the panel's view, the remaining *Brown* factors pointed to a conclusion that the two challenged informant statements were nontestimonial. 2015 WL 5458672, at *4.

The panel also believed the informant's statements in this case were comparable to informant statements considered in *United State v. Hendricks*, 395 F.3d 173 (3d Cir. 2005), which were held to be nontestimonial. The prosecution had asserted in *Hendricks* that the recorded statements were not admitted for the truth of the matter asserted. Rather,

7

they provided "context" for statements of various defendants who could also be heard on recorded conversations about illegal drug trade. 395 F.3d at 184.

The panel did not independently assess whether the informant's statements challenged in this case met any Kansas hearsay exception. It did hold in the alternative that any Confrontation Clause error in admitting the informant's statements into evidence was harmless. *Williams*, 2015 WL 5458672, at *6 (citing *State v. Ward*, 292 Kan. 541, 565, 569, 256 P.3d 801 [2011]).

In his petition for review, Williams specifically takes issue with the Court of Appeals' observation that the informants' statements "were not made to a law enforcement officer or to another government official," 2015 WL 5458672, at *4, arguing that such a rationale for holding a statement nontestimonial could entirely undermine the Confrontation Clause. Williams also singles out the panel's statement that the informant's single word "meth" was not "offered to . . . [identify] the substance [the defendant] was selling" for particular criticism:

> "[T]he district court did not limit the use of the statements at all. It [would be] an unusually prescient jury that would know that a statement identifying the subject of a controlled [buy] as 'meth' couldn't be used to help prove that the subject was methamphetamine."

Williams also attacks the panel's alternative harmless error holding by arguing that, absent the confidential informant's recorded greeting of him, the State's evidence could not have carried the day. Specifically, he says that the law enforcement testimony about recognizing Williams' cell-phone photo likeness and recorded voice was not "so overwhelming and undisputed that a jury might not have formed a reasonable doubt regarding the identity of the person allegedly selling drugs."

8

The State did not file a written response to Williams' petition for review or a supplemental brief after the petition was granted by this court. It did, however, submit a letter of additional authority under Rule 6.09 (2017 Kan. S. Ct. R. 39). The letter asserted that the district court judgment could be affirmed if it reached the right result, even if it did so for the wrong reason, citing *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 525, 113 P.3d 241 (2005). Previewing the prosecutor's focus at oral argument before us, the letter cited decisions from the Second, Fifth, Seventh, Ninth, and Eleventh Circuits for the proposition that a nontestifying informant's or other person's statements could be admitted in a criminal trial to provide context rather than for the truth of the matter asserted. See *United States v. Paulino*, 445 F.3d 211, 216 (2d Cir. 2006); *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006); *United States v. Rios*, 298 Fed. Appx. 312, 314 (5th Cir. 2008) (unpublished opinion); *United States v. Louis*, 233 Fed. Appx. 933, 935 (11th Cir. 2007) (unpublished opinion); *United States v. Standley,* 121 Fed. Appx. 728, 729 (9th Cir. 2005) (unpublished opinion).

DISCUSSION

An appellate court employs an unlimited standard of review when addressing whether a defendant's right to confront witnesses under the Sixth Amendment has been violated. *State v. Johnson*, 297 Kan. 210, 224, 301 P.3d 287 (2013).

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This "bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

9

In *Crawford*, the United States Supreme Court held that the Confrontation Clause applies to "testimonial" statements and prohibits the admission of such statements by a witness "who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 54. Although *Crawford* limited the Confrontation Clause's application to "testimonial" statements, it did not provide an exhaustive definition of the term.

In *State v. Brown*, 285 Kan. 261, Syl. ¶ 15, 173 P.3d 612 (2007), this court synthesized a multifactor system for courts to use when determining whether an out-of-court statement by a nontestifying declarant is testimonial under the Confrontation Clause. The factors were based on precedent from the United States Supreme Court and this court then available: *Crawford* itself; *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *State v. Miller*, 284 Kan. 682, 163 P.3d 267 (2007); and *State v. Henderson*, 284 Kan. 267, 160 P.3d 776 (2007). The factors are:

"(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime?

"(2) Was the statement made to a law enforcement officer or to another government official?

"(3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether

(a) the declarant was speaking about events as they were actually happening, instead of describing past events;

(b) the statement was made while the declarant was in immediate danger, *i.e.,* during an ongoing emergency;

10

(c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and

(d) the interview was part of a governmental investigation; and

"(4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.,* was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?" *Brown*, 285 Kan. at 291.

The United States Supreme Court has not yet directly addressed statements made by informants under *Crawford*. But we review its decisions in this area for the guidance they can provide on the federal constitutional question before us today.

In *Crawford*, in addition to laying out the Confrontation Clause analysis in broad strokes, the Supreme Court provided historical context for the types of abuses the Clause was meant to eliminate.

Although the right to confront one's accuser is a concept dating to Roman times, the founding generation's source of the concept was the English common law. *Crawford*, 541 U.S. at 43. "The common-law tradition is one of live testimony in court subject to adversarial testing, while the civil law condones examination in private by judicial officers." 541 U.S. at 43. But at times England adopted civil-law elements, such as allowing a justice of the peace to examine suspects and witnesses before trial and then reading of the examination in court in lieu of live testimony. 541 U.S. at 43. The practice "'occasioned frequent demands by the prisoner to have his "accusers," *i.e.*, the witnesses against him, brought before him face to face.'" 541 U.S. at 43.

One of the "most notorious" instances of the substitute practice was the 1603 trial of Sir Walter Raleigh for treason. 541 U.S. at 44. Raleigh's alleged accomplice implicated him in the accomplice's examination before the Privy Council and in a letter. 541 U.S. at 44. These were read to the jury at Raleigh's trial. 541 U.S. at 44. Raleigh argued that his accuser had named him in hopes of saving himself. Raleigh demanded that his accuser, Lord Cobham, be ordered to appear. "The Proof of the Common Law is by witness and jury: let Cobham be here, let him speak it. Call my accuser before my face . . . .'" 541 U.S. at 44 (quoting *Raleigh's Case*, 2 How. St. Tr. 1, 15-16 [1603]). Raleigh's demand was refused, and he was convicted by a jury and sentenced to death. *Crawford*, 541 U.S. at 44. One of the trial judges "later lamented that '"the justice of England has never been so degraded and injured as by the condemnation of Sir Walter Raleigh."'" 541 U.S. at 44 (quoting 1 D. Jardine, Criminal Trials 520 [1832]). Through statutory and judicial reform, English law developed a right of confrontation to limit such practices. *Crawford*, 541 U.S. at 44.

The *Crawford* Court also acknowledged controversial examination processes used in the American colonies, such as the one that prompted the Virginia Council to protest the Governor for having "'privately issued several commissions to examine witnesses against particular men *ex parte*.'" 541 U.S. at 47 (quoting A Memorial Concerning the Maladministrations of His Excellency Francis Nicholson, reprinted in 9 English Historical Documents 253, 257 [D. Douglas ed. 1955]). The Council "complain[ed] that 'the person accused is not admitted to be confronted with, or defend himself against his defamers.'" *Crawford*, 541 U.S. at 47. As a result of such events, many declarations of rights adopted about the time of the Revolution guaranteed a right of confrontation. 541 U.S. at 47; see, *e.g.*, Virginia Declaration of Rights § 8 (1776). But the proposed federal Constitution did not contain such a provision. Many objected to this omission, in some cases comparing Congressional power to "'institute judicatories little less inauspicious than a certain tribunal in Spain, . . . the *Inquisition*.'" 541 U.S. at 48-49 (quoting 2

12

Debates on the Federal Constitution 110-111 [J. Elliot 2d ed. 1863]). As a result of these criticisms, the First Congress included the Confrontation Clause in its proposal that became the Sixth Amendment. 541 U.S. at 49.

Based on this history, the Supreme Court concluded that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." 541 U.S. at 50. The Court rejected the view "that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon 'the law of Evidence for the time being.'" 541 U.S. at 50-51. "Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices. Raleigh was, after all, perfectly free to confront those who read Cobham's confession in court." 541 U.S. at 51.

Yet the Court acknowledged that not all hearsay implicates the Confrontation Clause:  "An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted." 541 U.S. at 51. On the other hand, some ex parte examinations may be admissible under evidentiary hearsay rules, "but the Framers certainly would not have condoned them." 541 U.S. at 51.

Before *Crawford*, the Court's Confrontation Clause jurisprudence had focused on the reliability of statements. But the *Crawford* Court rejected this approach. The Framers did not intend to leave the Sixth Amendment's protection "to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" 541 U.S. at 61. "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee." 541 U.S. at 61. It demands, "not that evidence be reliable,

but that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination." 541 U.S. at 61. The Court noted that in Raleigh's paradigmatic case, the prosecution responded to Raleigh's demand to confront his accuser "with many of the arguments a court applying [pre-*Crawford* precedent] might invoke today:  that Cobham's statements were self-inculpatory, . . . that they were not made in the heat of passion, . . . and that they were not 'extracted from [him] upon any hopes or promise of Pardon.'" 541 U.S. at 62. "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." 541 U.S. at 62.

The Court did not define all possible testimonial statements but did state that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68.

On the facts of *Crawford*, the Court held that the challenged statements were testimonial and should have been excluded because the defendant had not had an opportunity to cross-examine the witness. 541 U.S. at 68. The defendant had stabbed a man who allegedly tried to rape his wife and then claimed self-defense. The defendant's wife, who had seen the stabbing, had been questioned by police about what happened. The wife did not testify at trial because of the state's marital privilege, but the privilege did not extend to out-of-court statements, and the wife's tape-recorded statement to police detectives was played for the jury. The Court concluded that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." 541 U.S. at 52. The absence of an oath was not dispositive. 541 U.S. at 52.

In *Davis v. Washington*, and its companion case *Hammon v. Indiana*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Court further defined the contours of testimonial statements. Both cases involved a domestic disturbance.

In *Davis*, defendant Adrian Davis challenged the introduction of statements made by Michelle McCottry to a 911 operator. During a 911 call, through responses to the 911 operator's questions, McCottry described a domestic assault as it happened. McCottry was able to answer questions about her residence, whether there were any weapons, and whether her assailant had been drinking. She also provided the operator with the assailant's name and birthdate. Within 4 minutes of the 911 call, police offers arrived and "observed McCottry's shaken state, the 'fresh injuries to her forearm and her face,' and her 'frantic efforts to gather her belongings and her children so that they could leave the residence.'" 547 U.S. at 818.

In *Hammon*, police officers responded to a reported domestic disturbance at the home of Hershel and Amy Hammon. Eventually one officer spoke to Hershel in the kitchen while another spoke to Amy in the living room. After hearing Amy's account, an officer had her fill out and sign a battery affidavit. In the affidavit, Amy wrote: "'Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter.'" 547 U.S. at 820.

In its analysis, the Court again declined to provide an exhaustive definition or description of all testimonial statements, but it did outline what has become known as the "primary purpose" test:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to

15

enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822.

In a footnote, the Court noted that, although it had framed the test in terms of an "interrogation," that selection of the frame was attributable to the facts of the two cases and was not intended to imply that that statements made in the absence of interrogation are necessarily nontestimonial. 547 U.S. at 822 n.1 (noting also: part of evidence against Raleigh—a letter from Cobham—"plainly *not* the result of sustained questioning").

With specific respect to *Davis*, the Court framed the question as "whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements." 547 U.S. at 826. In *Crawford*, when the Court said interrogations by law enforcement fell within the class of testimonial hearsay, it had in mind "interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Davis*, 547 U.S. at 826. In contrast, "the initial interrogation conducted in . . . a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." 547 U.S. at 827. In *Davis*, the declarant was narrating events as they happened, and any reasonable listener could recognize that McCottry was facing an ongoing emergency. 547 U.S. at 827. The Court also examined the nature of the questions that had been asked and determined that, when viewed objectively, the elicited statements were necessary to resolve the current emergency rather than simply to describe what had happened in the past. 547 U.S. at 827. "That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." 547 U.S. at 827. In addition, the Court acknowledged that the interview in *Davis* was much less formal than the interrogation that had occurred in *Crawford*. "She simply was not acting as a *witness*;

16

she was not *testifying*." 547 U.S. at 827-28. McCottry's statement was not "'a weaker substitute for live testimony' at trial," unlike the statements in *Raleigh's Case* or *Crawford* in which the ex parte communications "aligned perfectly with their courtroom analogues"; "[n]o 'witness' goes into court to proclaim an emergency and seek help." 547 U.S. at 828.

The statements in *Hammon* were much easier for the Supreme Court to classify, as they were not much different from the statements held to be testimonial in *Crawford*. "It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged." 547 U.S. at 829. There was no ongoing emergency to respond to at the time the officers arrived. The challenged statements were not made in responses to questions of "'what is happening,' but rather 'what happened.'" 547 U.S. at 830. The primary, if not sole, purpose of the interrogation was to investigate a crime. 547 U.S. at 830. "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." 547 U.S. at 830.

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), the Court addressed whether the admission of laboratory results, which had demonstrated that a substance seized by police was cocaine, implicated the Confrontation Clause. The evidence consisted of three certificates of analysis that had been performed. "The certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under Massachusetts law." 557 U.S. at 308. Defendant Luis Melendez-Diaz objected under *Crawford* to the admission of the certificates, arguing that the analysts who tested the substance must testify in person.

17

At the outset of its analysis, the Court reiterated the basic description of testimonial statements from *Crawford* and concluded that there was "little doubt that the documents at issue in this case fall within the 'core class of testimonial statements.'" *Melendez-Diaz*, 557 U.S. at 310. The documents qualified "incontrovertibly" as "'solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact.'"" 557 U.S. at 310. Moreover, "not only were the affidavits '"made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,"' but also 'under Massachusetts law the *sole purpose* of the affidavits was to provide "prima facie evidence of the composition, quality, and the net weight" of the analyzed substance.'" 557 U.S. at 311. Under *Crawford*, the certificates were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment, requiring a showing that the analysts were unavailable to testify at trial and that the defendant had had a prior opportunity to cross-examine them. *Melendez-Diaz*, 557 U.S. at 311.

After reaching its holding, the Court addressed various arguments raised by the parties and the dissent. Of particular note was the argument that the analysts were not subject to confrontation because they were not "accusatory" witnesses and their testimony was inculpatory "only when taken together with other evidence linking [the defendant] to the contraband." 557 U.S. at 313. The Court rejected this contextual argument, contrasting the language of the Confrontation Clause with that of the Compulsory Process Clause, which guarantees a defendant the right to call witnesses "'in his favor.'" 557 U.S. at 313. The Sixth Amendment "contemplates two classes of witnesses—those against the defendant and those in his favor. The prosecution *must* produce the former; the defendant *may* call the latter." 557 U.S. at 313-14. "[T]here is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." 557 U.S. at 314.

18

The Court also rejected arguments that "the analysts should not be subject to confrontation because they are not 'conventional' (or 'typical' or 'ordinary') witnesses of the sort whose *ex parte* testimony was most notoriously used at the trial of Sir Walter Raleigh." 557 U.S. at 315. Although *Crawford* had recognized the ex parte examination used at Raleigh's trial as having "'long been thought a paradigmatic confrontation violation,'" "the paradigmatic case identifies the core of the right to confrontation, not its limits." *Melendez-Diaz*, 557 U.S. at 315.

Addressing another argument, the Court rejected the notion that the analysts need not be subjected to confrontation because the testimony at issue is "neutral, scientific testing," rather than "testimony recounting historical events, which is 'prone to distortion or manipulation.'" 557 U.S. at 317. It is not evident that "'neutral scientific testing' is as neutral or reliable" as suggested. 557 U.S. at 318. "Forensic evidence is not uniquely immune from the risk of manipulation." 557 U.S. at 318. "Confrontation is one means of ensuring accurate forensic analysis." 557 U.S. at 318. Although "an honest analyst will not alter his testimony when forced to confront the defendant, . . . the same cannot be said of the fraudulent analyst." 557 U.S. at 319. Moreover, "[c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." 557 U.S. at 319.

Finally, the Court rejected the argument that the certificates should be admissible without confrontation because they were akin to official business records. Although documents kept in the regular course of business may be admitted despite their hearsay status, it is not the case "if the regularly conducted business activity is the production of evidence for use at trial." 557 U.S. at 321. "The analysts' certificates—like police reports generated by law enforcement officials—do not qualify as business or public records for precisely the same reason." 557 U.S. at 321-22.

In *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), the Court addressed whether the person testifying to the results of laboratory testing must be the person who conducted the test as opposed to someone otherwise familiar with procedures or the documentation. Defendant Donald Bullcoming was charged with driving while intoxicated. The principal evidence against him was a forensic laboratory report based on showing the blood-alcohol concentration in his blood sample to be well above the threshold necessary to be convicted. At trial, the State called as a witness an analyst who was familiar with the laboratory's testing procedures but who was not the person who had participated in or observed the testing of Bullcoming's particular blood sample. The Court held that the testimony of an analyst who did not have personal knowledge of the testing of the sample in question did not satisfy the requirements of the Confrontation Clause. 564 U.S. at 652.

A lower court that had affirmed Bullcoming's convictions had treated the analyst as having "'simply transcribed the resul[t] generated by the gas chromatograph machine.'" 564 U.S. at 659. The Court rejected this idea, analogizing to the impropriety of one police officer observing an objective fact, such as a read-out from a radar gun; putting the result in writing; and then having another officer familiar with the technology testify. 564 U.S. at 660 (citing *Davis*, 547 U.S. at 825).

The State advanced similar arguments to those made in *Melendez-Diaz*. It argued that the analyst's affirmation of the testing results were not "adversarial" or "inquisitorial." *Bullcoming*, 564 U.S. at 664. But, as *Melendez-Diaz* had made clear, a "document created solely for an 'evidentiary purpose' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming*, 564 U.S. at 664. Unlike the documents in *Melendez-Diaz*, the *Bullcoming* documents were not sworn before a notary public. But, again, "the absence of [an] oath [was] not dispositive" of the question whether a statement was testimonial. 564 U.S. at 664.

In between the *Melendez-Diaz* and *Bullcoming* decisions regarding lab results, the Supreme Court also decided *Michigan v. Bryant*, 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). In that case, the Court addressed the circumstances of an "ongoing emergency" in a new context: "a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim." 562 U.S. at 359. At issue were on-the-scene statements made by the victim in response to police questioning. These facts required the Court to clarify what *Davis* had meant when it focused on whether "'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency'" and to determine whether "the 'ongoing emergency' discussed in *Davis* extends beyond an initial victim to a potential threat to the responding police and the public at large." 562 U.S. at 359.

The Court began its analysis by reiterating that determination of the "primary purpose" of an interrogation is an objective endeavor. 562 U.S. at 359. This objective analysis includes the circumstances in which an encounter occurs—"*e.g.*, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards." 562 U.S. at 360.

> "The statements and actions of the parties must . . . be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and circumstances in which the encounter occurred." 562 U.S. at 360.

Turning to the existence of an ongoing emergency, the Court noted that the "existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than

21

'prov[ing] past events potentially relevant to later criminal prosecution.'" 562 U.S. at 361. Instead, the participants want to end "'a threatening situation.'" 562 U.S. at 361. The implicit rationale of *Davis* was that if the primary purpose in making a statement is to resolve an emergency, the prospect of fabrication is significantly diminished and thus the Confrontation Clause does not require that such statements be subjected to the crucible of cross-examination. 562 U.S. at 361. The Court noted that whether an emergency exists is a "highly context-dependent inquiry" and cautioned that even though an ongoing emergency is broader than the type of emergency at issue in *Davis*, "none of this suggests that an emergency is ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose." 562 U.S. at 365. Moreover, the existence or non-existence of an ongoing emergency is not dispositive of the testimonial inquiry; "[a]s *Davis* made clear, whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." 562 U.S. at 366.

The Court also stressed that

"[f]ormality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution,' . . . informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." 562 U.S. at 366 (quoting *Davis*, 547 U.S. at 822).

"In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." 562 U.S. at 367. "The combined approach . . . ameliorates problems that could arise from looking solely to one participant," such as "mixed motives on the part of both interrogators and declarants." 562 U.S. at 368.

22

In summary, the Court directed reviewing courts to

"determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. . . . [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." 562 U.S. at 370-71.

On the facts of the *Bryant* case, the Court ultimately concluded that "there was an ongoing emergency here where an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded Covington within a few blocks and a few minutes of the location where the police found Covington." 562 U.S. at 374. But the existence of an ongoing emergency alone did not answer whether the statements were testimonial. 562 U.S. at 374. Ultimately,

"[b]ecause the circumstances of the encounter as well as the statements and actions of Covington and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency,' . . . Covington's identification and description of the shooter and the location of the shooting were not testimonial hearsay." 562 U.S. at 377-78.

In 2015's *Ohio v. Clark*, 576 U.S. ___, 135 S. Ct. 2173, 192 L. Ed. 2d 306, the Supreme Court addressed the admission of statements made by 3-year-old L.P. to preschool teachers, which alleged defendant Darius Clark had abused L.P. A teacher noticed that L.P.'s left eye appeared bloodshot, which led to questioning about what had

23

happened and a discovery of red marks, """like whips of some sort,""" on L.P.'s face. 135 S. Ct. at 2178. L.P. was asked "'Who did this? What happened to you?'" to which L.P responded "'Dee, Dee,'" which turned out to be a reference to Clark. 135 S. Ct. at 2178. Before trial, the judge determined that L.P. was not competent to testify, but Ohio rules of evidence would permit admission of hearsay statements made by child abuse victims.

*Clark* thus addressed statements made to persons other than police, leaving the door open for "at least some statements to individuals who are not law enforcement officers" to raise Confrontation Clause concerns. The Court declined to adopt a categorical rule excluding such statements from the Sixth Amendment's reach. 135 S. Ct. at 2181. Still, the identity of the listener is "highly relevant" because "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." 135 S. Ct. at 2182. The Court ultimately concluded that "L.P.'s statements occurred in the context of an ongoing emergency involving suspected child abuse" and "the immediate concern was to protect a vulnerable child who needed help." 135 S. Ct. at 2181. "L.P.'s teachers were not sure who had abused him or how best to secure his safety." 135 S. Ct. at 2181. "There is no indication that the primary purpose of the conversation was to gather evidence for Clark's prosecution." 135 S. Ct. at 2181.

The child's young age fortified the Court's conclusion. "[S]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." 135 S. Ct. at 2182. Research indicates "young children 'have little understanding of prosecution,'" making it "extremely unlikely that a 3-year-old child in L.P.'s position would intend his statements to be a substitute for trial testimony." 135 S. Ct. at 2182. Moreover, such statements were admissible at common law. An 18th century English court had "'tolerated flagrant hearsay in rape prosecutions involving a child victim who was not competent to testify because she was too young to appreciate the significance of her oath.'" 135 S. Ct.

at 2182 (quoting J. Langbein, The Origins of Adversary Criminal Trial 239 [2003]). When English courts excluded such statements, "they appeared to do so because the child should have been ruled competent to testify, not because the statements were otherwise inadmissible." 135 S. Ct. at 2182.

Certain lower courts have directly addressed whether out-of-court statements by informants are testimonial. These cases can be divided into two classes. The first class addresses information given to police officers by confidential informants for use in a criminal investigation. See, *e.g.*, *United States v. Cromer*, 389 F.3d 662 (2004). Such statements generally are held to be testimonial. 389 F.3d at 671. The second class addresses statements made by undercover informants to a defendant or to nongovernmental personnel during conversations the informant knows the government is recording. See, *e.g.*, *State v. Smith*, 289 Conn. 598, 960 A.2d 993 (2008). Such statements generally are also held to be testimonial, but the statements often have been admissible nonetheless because they were not offered for the truth of the matter asserted. See, *e.g.*, *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011).

Connecticut's *Smith* case is especially instructive because it addresses several types of informant statements, including some offered for their truth and some offered merely for context. In that case, defendant Lawrence Smith was convicted of murder. On appeal, Smith argued that the trial court improperly admitted a recorded conversation between Smith's coconspirator and a confidential informant because the included statements of the informant violated Smith's right to confrontation. The recording was nearly 4 hours long and included a variety of informant statements. Before trial, the State conceded that the informant had been acting as a police agent, and Smith conceded that the statements by the coconspirator were nontestimonial.

Because of the length of the recorded conversation, the court divided the informant's statements into three categories: (1) nonassertive vocalizations, such as "mm-hmm" or "yeah"; (2) questions the informant posed to the coconspirator about the crime; and (3) statements the informant made that directly implicated the coconspirator or the defendant in the commission of the crime. 289 Conn. at 626.

The court began its analysis by noting that many federal and state courts had concluded that when "an informant's statements were used only to provide context for the incriminating statements of the other party . . . the informant's statements were neither hearsay nor considered testimonial statements for the purpose of the [C]onfrontation [C]lause." 289 Conn. at 625. But the court cautioned that when applying this contextual approach, "there is a fine line between properly admitting an informant's statements under this theory and improperly admitting statements that are truly testimonial." 289 Conn. at 625. Moreover, "[t]here is a significant risk that assertive statements made by an informant and included as part of a recording may be perceived as substantive evidence of the defendant's guilt in the absence of any limiting instruction." 289 Conn. at 625.

The court easily concluded that the nonassertive vocalizations were nontestimonial. "To the extent that they provide context for [the coconspirator's] statements, it is clear that they simply were common vocalizations used in conversation to acknowledge another person's words as a by-product of active listening rather than to assert any particular fact." 289 Conn. at 626.

The court also concluded that the second category of statements—questions posed by the informant about the crime—were nontestimonial. 289 Conn. at 626.

"The questions were used solely for the purpose of providing the context within which [the coconspirator's] answers could be understood. Indeed, questions standing alone make

26

no assertions at all. They are a means to obtain information, and as such are not "'solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact'" as provided by the general definition set forth in *Crawford v. Washington*, supra, 541 U.S. at 51, 124 S. Ct. 1354." *Smith*, 289 Conn. at 626.

With respect to the third category—statements made by the informant that directly implicated the coconspirator or the defendant in the commission of a crime—the court first concluded that the statements were hearsay—*i.e.*, offered for the truth of the matter asserted. 289 Conn. at 627. Although the State had initially asserted that the statements were merely offered for context, it admitted at oral argument that some statements had been offered for their truth. For example, the informant, referring to the defendant by name, stated that "'[Larry] always be lying' and 'Larry is the one who hide the body.'" 289 Conn. at 627. Because the statements were offered for their truth, whether they also were testimonial turned on "whether [the informant] would have a reasonable expectation that his words would be used in a subsequent prosecution." On the facts of the case, it was "beyond dispute" that the informant understood the recording would be used in a later prosecution. 289 Conn. at 627. "Indeed, in the hopes of receiving favorable treatment, he approached federal authorities specifically to obtain evidence they could use in subsequent prosecutions." 289 Conn. at 627. Because the statements were testimonial and because the defendant did not have an opportunity to cross-examine the informant, admitting the statements violated Smith's rights under the Confrontation Clause. 289 Conn. at 627-28.

Among the lower courts that have previously addressed informant statements is our own Court of Appeals. In a case that predated our *Brown* decision, *State v. Adams*, 35 Kan. App. 2d 439, 131 P.3d 556 (2006), the State introduced testimony from a detective who recounted statements made by a nontestifying informant during a telephone conversation with defendant Charles Adams. The goal of the informant's call

27

to Adams, which the informant knew that law enforcement would listen to, was to gather evidence for a future prosecution of Adams. 35 Kan. App. 2d at 444. The panel ruled that the informant's statements were testimonial. Because the State could not prove an attempted cocaine sale without the detective's inadmissible testimony about the informant's statements during the telephone call, the panel reversed Adams' conviction on that count of the charging document. 35 Kan. App. 2d at 444.

Our review of United States Supreme Court and lower court precedents persuades us that the multifactor test we outlined in *Brown* should not be regarded as the exclusive or all-encompassing template for determining whether a statement made by an absent declarant qualifies as testimonial under the Sixth Amendment. The formulation of the *Brown* test was a creature of its time, and a purely mechanical application of its factors in all instances threatens to ignore that the class of testimonial statements, as reflected in United States Supreme Court language, is broader than formal statements made to police during an interrogation to solve a crime. Instead, the inquiry should generally seek to identify statements that are by nature substituting for trial testimony. See *Davis v. Washington*, 547 U.S. 813, 828, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (declarant not acting as a witness, declarant not testifying; declarant's challenged statement "not 'a weaker substitute for live testimony' at trial"); see also *Melendez-Diaz*, 557 U.S. at 316 ("'The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.'"); *Davis*, 547 U.S. at 822 n.1 (although "primary purpose" test framed in terms of "interrogation," class of testimonial statements not limited to those elicited in interrogations).

Our expanded examination of previous decisions today makes the panel's heavy emphasis in this case on the fact that the informant's statements were not made during a police interrogation problematic. Neither an interrogation setting nor law enforcement

listeners are indispensable to a holding that an out-of-court statement is testimonial. See *Melendez-Diaz*, 557 U.S. at 316; *Clark*, 135 S. Ct. at 2182.

Another infirmity in the panel's decision is its reliance on *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987), a pre-*Crawford* case that *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004, cited favorably.

When discussing *United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005), the panel noted that the *Hendricks* court relied heavily on *Bourjaily*, which the panel characterized as "a case in which the United States Supreme Court rejected a claimed violation of the Confrontation Clause relating to a conversation between a defendant and a confidential informant." *Williams*, 2015 WL 5458672, at *5. This statement mischaracterized *Bourjaily* by putting the focus on the "conversation" rather than individual statements made by a particular declarant. On closer examination of *Bourjaily*'s facts, it is clear that the *Crawford* Court never intended to imply that statements made by an informant are per se beyond the scope of the Confrontation Clause.

In *Bourjaily*, an informant arranged to sell cocaine to Angelo Lonardo, and Lonardo agreed to find someone to distribute the drug. When the sale became imminent, Lonardo "stated in a tape-recorded telephone conversation that he had a 'gentleman friend' who had some questions to ask about the cocaine." 483 U.S. at 173. In a later call, the informant spoke to the "friend" about the quality and price of the drugs. 483 U.S. at 173-74. The "friend" turned out to be defendant John Bourjaily. The informant eventually sold the cocaine to Lonardo, and Bourjaily was arrested immediately after the sale when Lonardo put the drugs in Bourjaily's car. 483 U.S. at 173-74. At issue on appeal was the admission of "Lonardo's telephone statements regarding the participation of the 'friend' in

29

the transaction"—*i.e.*, statements made by Bourjaily's coconspirator rather than by the informant. 483 U.S. at 174. Despite facts involving an informant, the informant's statements were never in issue in the case. *Bourjaily* thus provides little guidance here.

The panel's decision also troubles us because of its apparent seduction by the State's argument that the informant's statements merely supplied context rather than substantive evidence supporting Williams' guilt. Although we appreciate that the Connecticut Supreme Court and other courts evidently have also been so seduced, see *Smith*, 289 Conn. at 625 (discussing statements' admission for truth of matter asserted as prerequisite to analysis of whether statements testimonial); see also *United States v. Tolliver*, 454 F.3d 600, 666 (confidential informant's statements admissible to put defendant's admissions on tapes into context), we cannot join this particular party. Our reading of the United States Supreme Court's decisions keeps us home.

First of all, not all hearsay implicates the Confrontation Clause and not all statements that implicate the Clause necessarily qualify as hearsay, *i.e*., out-of-court statements admitted into evidence to prove the truth of the matter asserted. See *Crawford*, 541 U.S. at 51. Hearsay and Confrontation Clause analyses are distinct, although the outcomes they lead to may overlap. *Cf. State v. Richmond,* 289 Kan. 419, 429 (2009) (discussing necessity for contemporaneous objections on hearsay, Confrontation Clause violation). Protection of a defendant's Sixth Amendment right is not dependent on "the vagaries of the rules of evidence." 541 U.S. at 61. Today we are not called upon to make an independent hearsay, or hearsay exception, analysis.

Second, we confess to some confusion on the distinction the State would like us to draw. Context has content. We cannot imagine any evidence of context that does not, and we fail to see the logic of opinions from other courts that state or imply otherwise.

30

And, third, even if the distinction between context and content has legal consequence, the facts before us leave no doubt that the informant's statements in this case, although brief, went well beyond context. The informant's statements, at a minimum, reinforced two pieces of information vital to the outcome the State sought from Williams' jury. They did not merely provide context. "Say hi to Dave" provided the jury with evidence of the identity of the methamphetamine seller, confirming Lind's testimony that Williams was the person who got into the car. Similarly, "meth" provided the jury with evidence of the subject of the transaction, which was confirmed by the KBI's testing of the substance Lind bought. The informant's brief statements were not, as asserted by Williams, the only proof on those two subjects, but they certainly were some of the substantive proof on those two subjects, in contrast to the minimizing argument of the State.

We also note that, in neither instance did the informant's conversational contribution take the form of a question, requiring a response from the defendant to provide a relevant fact. See *Smith*, 289 Conn. at 626 (questions are generally means to obtain information and not "'"solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact"'"). In neither instance was an ongoing emergency brought to a speedier, safer close or a potential danger averted. See *Clark*, 135 S. Ct. at 2181; *Bryant*, 562 U.S. at 374; *Davis*, 547 U.S. at 827. In neither instance did the informant merely report an observed fact. See *Bullcoming v. New Mexico*, 564 U.S. 647, 652, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

In addition, the State clearly offered the informant's two statements for the truth of the matter asserted. This point is obvious from the prosecutor's closing argument. The prosecutor explicitly referenced the "Say hi to Dave" statement as evidence to confirm Lind's testimony that the defendant was the person who had made the sale. Moreover, the

31

judge gave no contrary limiting instruction, a clarifying step suggested by Connecticut's *Smith* court, to prevent the jury from perceiving the evidence of the informant's statements as substantive evidence of the defendant's guilt. See 289 Conn. at 625.

In addition to our examination of statements themselves, as instructed by the Supreme Court's precedent, we make an objective study of whether the circumstances surrounding their utterance lead to a conclusion the statements were testimonial. Those circumstances include that the statements were made during a controlled drug buy set up for the express purpose of creating evidence for use at a future prosecution. This makes the statements more akin to the laboratory reports at the center of *Bullcoming* and *Melendez-Diaz* than to "a casual remark to an acquaintance." *Crawford*, 541 U.S. at 51. Indeed, the statements share much in common with those from "[a]n accuser who makes a formal statement to government officers," as in the paradigmatic *Raleigh's Case*. *Crawford*, 541 U.S. at 51. In the words of the first *Brown* factor, an objective witness in the informant's position would "reasonably believe" her statements "would later be available for use in the prosecution of a crime." *State v. Brown*, 285 Kan. 261, 291, 173 P.3d 612 (2007).

The State's argument that there is no evidence the informant knew the conversation was being recorded also is unavailing for three reasons. First, the test is objective rather than subjective. See *Michigan v. Bryant*, 562 U.S. 344, 360, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). Second, when courts have held informant statements recorded without the informant's knowledge to be nontestimonial, the rationale has not rested on the declarant's lack of knowledge of the recording but on the declarant's lack of knowledge that "authorities" were or would be listening to the conversation. See *Hendricks*, 395 F.3d at 181 (conversations between defendants, third parties "surreptitiously intercepted" by law enforcement through wiretaps; recordings cannot be deemed "testimonial" because declarants did not make statements thinking they would be

32

available for later prosecution; very purpose of such wiretaps to capture conversations without participants knowing that authorities listening). In other words, the declarant would not have had a reasonable expectation that precise statements would be used in a future prosecution. On the other hand, cases that have highlighted the fact that a declarant knew the conversation was being recorded on the way to holding an informant's statements to be testimonial have done so because there was no law enforcement present and the declarant was the one wearing a recording device. See, *e.g.*, *Gaytan*, 649 F.3d at 579. And, third, regardless of whether the drug deal was recorded electronically and regardless of whether the informant was aware of that fact, a reasonable informant would have known the encounter was "recorded" in the memory of the participants, each of which could eventually testify to who said what when.

Other circumstances surrounding the informant's statements in this case also support a conclusion that the statements qualified as testimonial. The first, "Say hi to Dave," was actually made to a law enforcement agent. The second, "meth," was made knowing that a law enforcement agent was in the car and, in fact, on behalf of that agent in his role as drug buyer. See *Brown*, 285 Kan. at 291 (second factor). In terms of primary purpose, see *Brown*, 285 Kan. at 291 (third factor), we have already established the sole purpose of the drug buy in which the informant was playing her own part. That sole purpose of the encounter—which the informant was well aware of—was to create an evidentiary record to convict Williams. It succeeded.

Finally, we address whether the formality of the informant's statements in this case was sufficient to make them "inherently testimonial." Brown's formulation of this factor, as alluded to in our criticism of the Court of Appeals panel above, is too tied to analysis of a police interrogation scenario to translate very well to the circumstances in this case. But, in our view, Williams' argument on this factor makes a valid point. The planned drug buy here lacked the trappings of a formal police interrogation, but it nevertheless

33

followed a law enforcement script in a setting and with actors and props and costumes it supplied, controlled, and mined, as always intended, for damning evidence against the drug seller.

We conclude from all of this discussion that the two statements by the informant were testimonial. Because Williams did not have an opportunity to cross-examine the informant, admission of the statements violated Williams' right under the Confrontation Clause. We now turn to whether the error was harmless.

Having decided that the district judge's admission of the challenged informant statements violated Williams' confrontation right, we apply the federal constitutional harmless error standard of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See *State v. Bennington*, 293 Kan. 503, 524, 264 P.3d 440 (2011) ("'Violation of the Confrontation Clause is subject to analysis under the federal harmless error rule.'"). Under the federal constitutional standard, an

> "'error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict.'" *State v. Dupree*, 304 Kan. 377, 402-03, 373 P.3d 811 (2016) (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011], *cert. denied* 565 U.S. 1221 [2012]).

To prevent reversal, the State, as the party benefiting from the error, must prove that "there is no reasonable possibility that the error contributed to the verdict." *Ward*, 292 Kan. 541, Syl. ¶ 6. To meet this burden, the State relies on the cumulative weight of other evidence proving the two propositions that the informant's statements tended to establish: the identity of the person making the sale and the substance subject to that sale. The State correctly notes that Lind provided a first-person account of the drug sale

and that he identified Williams as the seller. Moreover, Braun, who was listening to the sale as it happened through Lind's wire, was able to identify Williams' voice. Lind also testified that, based on his law enforcement experience, the substance he purchased was methamphetamine. This was further confirmed at the time of the sale by Lind's field test of the substance. The identity of the substance as methamphetamine was ultimately confirmed by the more rigorous testing of the KBI forensic laboratory, as testified to by Riddle.

Based on the overwhelming weight of the other evidence against Williams, we have no hesitance in holding that there is no reasonable possibility the error in admitting the informant's testimonial evidence contributed to the verdict. The Sixth Amendment violation was harmless.

CONCLUSION

The decision of the Court of Appeals is affirmed, and the judgment of the district court is affirmed.

ROSEN, J., not participating.
MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 111,046 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-2616.